**In re IML FREIGHT, INC., a Utah Corporation, Debtor.**

**In re IML PROPERTIES, INC., a Utah Corporation, Debtor.**

**In re INTERSTATE RENTAL OF UTAH, INC., a Utah Corporation, Debtor.**

**Bankruptcy Nos. 83C–01950, 83C–01951 and 83C–01952.**

United States Bankruptcy Court, D. Utah.

June 25, 1985.

Robert D. Merrill and Danny C. Kelly, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, and Russell C. Fericks, Richards, Brandt, Miller & Nelson, Salt Lake City, Utah, for trustee.

Douglas L. Furth, Fabian & Clendenin, Salt Lake City, Utah, for Tradex, Inc.

Frederick Perillo, Goldberg, Previant, Uelman, Gratz, Miller & Brueggeman, Milwaukee, Wis., for the Teamsters Nat. Freight Industry Negotiating Committee.

David E. Leta, Hansen, Jones, Maycock & Leta, Salt Lake City, Utah, for the Joint Bd. of Trustees of the Western Conference of Teamsters Pension Trust Fund.

James C. Swindler, Rooker, Larsen, Kimball & Parr, Salt Lake City, Utah, for the Central States, Southeast and Southwest Areas Health and Welfare and Pension Funds.

David M. Connors, LeBoeuf, Lamb, Leiby & MacRae, Salt Lake City, Utah, for the unsecured creditors' committee.

## MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

### CASE SUMMARY

This matter came before the Court on January 4, 1985, on the trustee's Motion for an Order Permitting Payment of Allowed Professional Fees. The Court is called upon to decide whether and to what extent professional persons employed in a superseded Chapter 11 case should be paid their allowed administrative expense claims where there are insufficient assets in the debtor's estate to pay all Chapter 11 administrative claims in full. For the reasons hereinafter set forth, the Court shall not authorize the trustee to disburse funds to Chapter 11 administrative claimants at this time.

### FACTUAL AND PROCEDURAL BACKGROUND

On July 15, 1983, IML Freight, Inc., IML Properties, Inc. and Interstate Rental of Utah, Inc. (hereinafter collectively referred to as "IML" or "the debtor")[1] filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On that date the Court entered an order for joint administration of their estates. Subsequently, the debtors were substantively consolidated. IML was a major transcontinental trucking company, and one of the larger common carries of general commodities by motor vehicle in the United States. The debtor in possession was represented by Watkiss & Campbell, a Salt Lake City, Utah, law firm and Stutman, Treister & Glatt, a Los Angeles, California, law firm.[2]

---

**1.** IML Freight, Inc. is the principal operating entity of the debtors' business. IML Properties, Inc. and Interstate Rental of Utah, Inc. are wholly owned subsidiaries of IML Freight, Inc.

**2.** Watkiss & Campbell received pre-petition fees from IML Freight, Inc. in the amount of $32,-521.50 for services rendered in connection with reorganization and bankruptcy matters, and a retainer in the amount of $66,661.10 for services

On October 15, 1983, a hearing was held on the motion of the creditors' committee for appointment of a trustee. The Court determined that appointment of a trustee was in the best interest of creditors and entered an order on October 18 appointing Allan D. Musgrove trustee. On October 21 the trustee accepted his appointment and was subsequently qualified upon entry of the order approving his bond. Musgrove served as trustee until June 3, 1984, at which time he resigned. On May 17, 1984, the Court entered an order providing for appointment of a co-trustee to serve in the case jointly with Musgrove until June 3, at which time the co-trustee would become successor trustee. Main Hurdman, an accounting firm which has served as trustee in other large Chapter 11 cases before this Court, was appointed as co-trustee. During the course of this case, numerous professional persons with administrative expense claims have been employed by the debtor in possession, the trustee, and the unsecured creditors' committee.[3]

On December 20, 1983, a hearing was held to consider the following applications for allowance of interim compensation under Section 331 of the Bankruptcy Code:

(1) The California law firm of Gibson, Dunn & Crutcher, special counsel for the debtor, which sought $18,216.00 in fees and $3,885.19 in expenses, for a total of $22,101.19;

(2) The California law firm of Stutman, Treister & Glatt, co-counsel for the debtor, which sought $125,600.00 in fees and $11,000.00 in expenses, for a total of $136,600.00;

(3) The Utah law firm of Watkiss & Campbell, co-counsel for the debtor, which sought $79,822.50 in fees and $17,815.12 in expenses, for a total of $97,637.62;

(4) The Utah accounting firm of Arthur Young & Company, accountant for

to be rendered. Stutman, Treister & Glatt received a retainer from IML Freight, Inc. in the amount of $125,000.00 for services to be rendered to the debtor in possession during the bankruptcy case.

3. On July 19, 1983, the employment of the law firm of Gibson, Dunn & Crutcher as special labor counsel for the debtor in possession was authorized. On August 3, 1983, the Court entered an order approving the employment of the Salt Lake City, Utah, law firm of LeBoeuf, Lamb, Leiby & MacRae as attorney for the unsecured creditors' committee. On August 5, the Court entered orders authorizing the debtor in possession to employ Arthur Young & Company as its accountant and Michael Tennenbaum, Ph.D., as a consulting economist. On September 11, the Court authorized the debtor in possession to employ Johnson & Higgens of Colorado, Inc. as employee benefit plan consultants and actuaries. On October 21, 1983, the Court entered an order authorizing the trustee to employ Fox and Company as his accountant. On that same date, the Court entered an order authorizing the trustee to employ Richards, Brandt, Miller & Nelson and Van Cott, Bagley, Cornwall & McCarthy as his attorneys. Neither law firm received a retainer at that time. On October 30, the Court approved the employment of an accountant for the creditors' committee. On November 4, the Court entered an order authorizing the trustee to employ Corporate Risk Analysis Service Company for the purpose of performing audits of worker's compensation insurance matters with its compensation to be paid in the ordinary course of business as an administrative expense without further order of the Court. On November 8, the Court approved the trustee's employment of a management consultant, Northeast Management Corporation, whose compensation could also be paid in the ordinary course of business without further order of the Court. On November 30, 1983, the Court entered an order authorizing the trustee, Allan D. Musgrove, to employ himself as general manager of the debtors at a salary of $10,000.00, which sum would be deducted from any fee to which he would be entitled as trustee under Section 326 of the Bankruptcy Code. On January 9, 1984, the Court entered an order authorizing the employment of the law firm of Townsend & Townsend as special counsel to the trustee in connection with patent, trademark, copyright and related matters. On February 15, 1984, the Court entered an order authorizing the trustee to employ the law firm of Nelson & Harding as special counsel to represent him in labor matters. On June 6, 1984, the Court authorized Main Hurdman, co-trustee, to serve as its own accountant. On September 19, 1984, the Court entered an order authorizing the trustee to employ Stewart Grow & Associates as a real estate consultant and broker. The Court has also entered an order approving the trustee's employment of attorneys in Washington, Colorado, California, Illinois, Indiana and Missouri with respect to various litigation matters in those states.

the debtor, which sought $9,281.00 in fees and $421.00 in expenses, for a total of $9,702.00;

(5) The New York and Utah law firm of LeBoeuf, Lamb, Leiby & MacRae, counsel for the creditors' committee, which sought $63,417.50 in fees and $1,438.34 in expenses, for a total of $64,855.84;

(6) The Utah law firm of Richards, Brandt, Miller & Nelson, co-counsel for the trustee, which sought $42,000.00 in fees and $4,067.00 in expenses, for a total of $46,067.00; and

(7) The Utah law firm of Van Cott, Bagley, Cornwall & McCarthy, co-counsel for the trustee, which sought $31,000.00 in fees and $1,200.00 in expenses, for a total of $32,200.00.

Objections to the applications were filed by the Western Conference of Teamsters Pension Trust Fund and the Western Conference of Teamsters Health and Welfare Trust Fund (hereinafter collectively referred to as the "Western Conference Funds"), and the Central States, Southeast and Southwest Areas Pension Fund and the Central States, Southeast and Southwest Areas Health and Welfare Fund (hereinafter collectively referred to as the "Central States Funds").[4] The basis for these objections was that other first priority administrative claimants, such as the pension funds, should participate on a pro rata basis in any authorized payment of administrative expenses.[5] The Court allowed all fees and expenses in the amounts requested, except for fees for services rendered by Richards, Brandt, Miller & Nelson prior to the appointment of the trustee. The Court took under advisement the issue of whether or not the allowed professional fees should be paid ahead of other administrative claims.

On February 2, 1984, the trustee filed a motion for approval of his rejection of a collective bargaining agreement entered into post-petition. In a memorandum opinion dated March 7, 1984, this Court denied the trustee's motion.[6]

On March 12, 1984, following a strike against the debtor by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, resulting from alleged unfair labor practices and failure to pay health and welfare contributions, the trustee discontinued operation of the debtor's business. Since that date the trustee has been engaged in the liquidation of the debtor's assets.

In May, 1984, numerous fee applications were filed by professional persons employed in the case. On May 22, a hearing was held to consider the following applications for allowance of interim compensation:

(1) The Utah law firm of Richards, Brandt, Miller & Nelson, co-counsel for the trustee, which sought $160,073.50 in fees and $11,903.50 in expenses, for a total of $171,977.00;

(2) The Utah law firm of Van Cott, Bagley, Cornwall & McCarthy, co-counsel for the trustee, which sought $137,453.75 in fees and $8,766.53 in expenses, for a total of $146,220.28;

(3) The Utah accounting firm of Fox and Company, accountant for the trustee, which sought $74,121.50 in fees and $1,313.64 in expenses, for a total of $75,435.14;

(4) The Colorado law firm of Nelson & Harding, special labor counsel for the

---

**4.** The Western Conference Funds and the Central States Funds are both multiemployer pension and benefit plans which receive and administer contributions made by employers on behalf of their employees. The plans are governed by the Employee Retirement Income Security Act of 1973, 29 U.S.C. §§ 1001, *et seq.,* and the Multiemployer Pension Plan Amendments Act of 1980, Pub.L. 96–364, 94 Stat. 1208 (Sept. 26, 1980).

**5.** On December 2, 1983, the Court granted the motions of the Western Conference Funds and the Central States Funds to compel the trustee to pay all outstanding and unpaid post-petition pension and health and welfare contributions owed to the funds, and to pay current contributions as they become due.

**6.** *In re IML Freight, Inc.,* 37 B.R. 556, 11 B.C.D. 973, Bankr.L.Rep. (CCH) ¶ 69,738, 10 C.B.C.2d 263 (Bkrtcy.D.Utah 1984).

trustee, which sought $36,187.00 in fees and $9,882.23 in expenses, for a total of $46,069.23;

(5) The Indiana law firm of Rubin & Levin, special litigation counsel for the trustee, which sought $1,237.43 in fees;

(6) The Missouri law firm of Gage & Tucker, special labor counsel for the trustee, which sought $6,728.87 in fees;

(7) The New York and Utah law firm of LeBoeuf, Lamb, Leiby & MacRae, counsel for the creditors' committee, which sought $37,792.50 in fees and $2,193.29 in expenses, for a total of $39,-985.79;

(8) Individual members of the creditors' committee sought reimbursement of expenses in the total sum of $1,583.43;

(9) The Utah law firm of Watkiss & Campbell, co-counsel for the debtor, which sought $6,672.50 in fees and $3,323.42 in expenses, for a total of $9,995.92; and

(10) The California law firm of Stutman, Treister & Glatt, co-counsel for the debtor, which sought $2,500.00 in fees and $2,746.96 in expenses, for a total of $5,246.96.

Again, the applications were objected to by the Western Conference Funds and the Central States Funds. They renewed their earlier objection to payment to professional persons without concurrently making a pro rata payment to other administrative claimants. First National Bank of Boston, the principal secured creditor of the debtor, objected to payment out of its cash collateral because of uncertainties surrounding the estate's ability to satisfy its claim in full from the sale of assets.[7]

At the hearing on the fee applications on May 22, 1984, the Court heard vigorous argument by co-counsel for the trustee and counsel for the Western Conference Funds and the Central States Funds. The attorneys for the trustee pointed out that unlike the attorneys for the displaced debtor in possession, they had not received a retainer, but, in effect, were being asked to finance the case based on the expectation of interim payments.[8] The failure to receive these interim payments, counsel stated, was causing substantial financial hardship to their law firms.[9] Counsel for the trustee further argued that Section 331 of the Bankruptcy Code, as interpreted by this Court in *In re Callister*,[10] contemplates interim payments to professional persons during the progress of the case before payment to other administrative claimants.[11] Counsel for the Western Conference Funds informed the Court that prior to the hearing he had filed a proof of claim for an administrative expense in the amount of $7,115,562.05 based on the debtor's withdrawal liability for withdrawal from the multiemployer pension plan administered by the fund.[12] Counsel argued that there was no authority under the Bankruptcy Code for authorizing payment of professional compensation ahead of other administrative claims.[13] Counsel for Redex, Inc. appeared and joined in the objections of the pension and health and welfare funds, and reminded the Court of its Section 364(d) superpriority claim against all of the assets

---

7. The creditors' committee also filed an objection to the applications of Richards, Brandt, Miller & Nelson and Van Cott, Bagley, Cornwall & McCarthy, co-counsel for the trustee, based upon its contention that there was some duplication of services by the two law firms.

8. Transcript of Hearing at 12.

9. *Id.* at 8. The Court questioned whether the trustee's alternative might be to convert the case to Chapter 7 in order to assure payment to those whose services were necessary to effect the liquidation of the assets of the estate. *Id.* at 9. Counsel responded by stating that in the view of the trustee it was in the best interest of creditors

to continue the liquidation under Chapter 11. *Id.* at 9–10. On October 12, 1984, the trustee filed a motion to convert the cases to Chapter 7. The motion was granted on November 9. *See* text following footnote 18, *infra.*

10. 15 B.R. 521, 8 B.C.D. 446, 5 C.B.C.2d 1058 (Bkrtcy.D.Utah 1981), *appeal dismissed*, 673 F.2d 305 (10th Cir.1982), *aff'd*, 13 B.C.D. 21 (10th Cir.1984).

11. Transcript of Hearing, *supra* note 9, at 7.

12. *Id.* at 60.

13. *Id.* at 58.

of IML pursuant to its accounts receivable factoring agreements with the debtor. The amount then owing to Redex and subject to its superpriority was approximately $3,000,000.00.[14]

Counsel for the trustee, when asked by the Court, was unable to present evidence as to what a conservative estimate might be of the percentage of administrative claims that could be ultimately paid in the case.[15] Counsel stated that between one-half and two-thirds of the administrative expense claims would be challenged by the trustee.[16] At the conclusion of the hearing, the Court again took the matter under advisement.

While the Court grappled with the problem of determining whether to authorize payment of professional fees in view of these numerous uncertainties, a third hearing was scheduled to consider further interim fee requests. On September 25, 1984, a hearing was held to consider the following applications:

(1) The Utah law firm of Richards, Brandt, Miller & Nelson, co-counsel for the trustee, which sought $60,753.24 in fees and $8,302.92 in expenses, for a total of $69,056.16;

(2) The Utah law firm of Van Cott, Bagley, Cornwall & McCarthy, co-counsel for the trustee, which sought $59,916.25 in fees and $3,114.76 in expenses, for a total of $63,031.01;

(3) The Utah accounting firm of Main Hurdman, accountant for the trustee,

which sought $159,157.75 in fees and $3,668.18 in expenses, for a total of $162,825.93;

(4) The Colorado law firm of Nelson & Harding, special labor counsel for the trustee, which sought $3,000.00 in fees and expenses; and

(5) The New York and Utah law firm of LeBoeuf, Lamb, Leiby & MacRae, counsel for the creditors' committee, which sought $13,132.50 in fees and $352.62 in expenses, for a total of $13,485.12.

Both the Western Conference Funds and the Central States Funds renewed their prior objections. At the hearing, the Court allowed all fees and costs as prayed, including those presented at the December 20 and May 22 hearings, except those of Nelson & Harding, whose application lacked sufficient detail and itemization.[17] The trustee was authorized, subject to the consent of Redex, Inc. and Tradex, Inc. to pay one-fourth of all allowed fees and expenses.[18] Payment of the balance of the allowed fees and costs was taken under advisement, and the parties were invited to submit memoranda of law concerning such payment.

On October 12, 1984, the trustee filed a motion to convert the case to Chapter 7. On November 9, following a hearing on the trustee's motion, to which no party in interest objected, the Court entered an order of conversion and appointed the Chapter 11

---

14. *Id.* at 75–76.

15. *Id.* at 21.

16. *Id.* at 82.

17. Nelson & Harding was granted leave to file a supplemental application.

18. The doctrine of "partial payment" or "holdback," under which some courts would refuse to allow full payment of interim compensation and would arbitrarily withhold 25–50% until the final fee hearing, has been discredited in Chapter 11 cases. *See* R. Lieb, "Interim Attorneys' Fees: Payment in Full versus 'Holdback'," 1 Norton Bankruptcy Law Adviser 4–6 (Oct.1983); *In re Western Farmers Association,* 8 B.R. 539, 7 B.C.D. 197 (Bkrtcy.W.D.Wash.1981). *But cf., In*

re Four Star Terminals, 42 B.R. 419, 440–43 (Bkrtcy.D.Alaska 1984) (approving 25% "holdback"); *In re Nova Real Estate Investment Trust,* 25 B.R. 252, 253 n. 1, 9 B.C.D. 1310 (Bkrtcy.E.D.Va.1982) (counsel agreed to one-third "holdback" until final fee determination); *Matter of Georgia Steel, Inc.,* 19 B.R. 834, 839 (Bkrtcy.M.D.Ga.1982) (approving 25% "holdback"). In this Court's view, the doctrine remains applicable to cases in which there is a significant likelihood that the assets of the debtor's estate will be insufficient to satisfy all of the Chapter 11 administrative claims, or where conversion to Chapter 7 appears imminent. *Cf. In re American Resources Management Corp.,* 51 B.R. 713 (Bkrtcy.D.Utah 1985).

trustee, Main Hurdman, interim trustee.[19] Since conversion, the Court has authorized professional persons to apply for interim compensation every 60 days. After each fee hearing, the Court has authorized payment of all allowed fees.

On November 13, 1984, the trustee filed the present motion for authority to pay the balance of the professional fees and costs previously allowed but unpaid pursuant to the Court's order authorizing payment of one-fourth of such fees and costs. Numerous objections were filed and the matter was heard on January 4, 1985.

Counsel for the trustee, citing *In re Callister, supra*, contended that because attorneys' fees enjoy a statutory "preeminence" under Section 331, they are entitled to be paid in full and should not be subject to pro rata payment with other administrative expenses in the event funds are insufficient to pay all in full. Payment of the Chapter 11 fees was necessary, it was argued, to assure the continued efficient administration of the estate.

Counsel for the Western Conference Funds argued against payment unless the trustee could provide assurances that all administrative expenses of the same priority as the Chapter 11 professional fees would receive equal pro rata treatment. The *Callister* decision did not apply in this context, he argued, because that decision did not establish a priority system among administrative claimants, nor did it consider the effect of Section 726(b). Counsel also argued that immediate payment of Chapter 11 professional fees would confer no benefit to the Chapter 7 estate. Counsel for the Central States Funds advised the Court that the pension fund would soon file an administrative expense claim in the amount of $7,500,000.00, and argued that since there may be a $13,000,000.00 shortfall in funds available to satisfy Chapter 11 administrative claims, payment should await a determination of the assets available and the total amount of such claims. The fund also urged the Court to deny the motion because it would be inequitable to pay one category of administrative claimants in full while subjecting others to delay and the risk of partial payment.[20] Salt Lake Investors, a California limited partnership and owner of several terminals leased to the debtor, submitted a memorandum in opposition to the payment of the Chapter 11 professional fees, which argued that the trustee was attempting to fix an impermissible priority in favor of professionals within the class of administrative claims. "Given that there are no intra-class distinctions among administrative claims, there is plainly no basis for the moving parties' position."[21] Counsel for the Teamsters National Freight Industry Negotiating Com-

**19.** No trustee was elected by creditors at the meeting held pursuant to Section 341 of the Code, and Main Hurdman became the permanent trustee. *See* 11 U.S.C. § 702(d).

**20.** Memorandum of Central States Funds in Opposition to Motion for Order Permitting Payment of Allowed Professional Fees, at 4 (Nov. 27, 1984).

**21.** Memorandum in Support of Objection to Trustee's Motion for Order Permitting Payment of Allowed Professional Fees, at 4 (Dec. 7, 1984). In support of its motion, the trustee submitted an affidavit of F. Wayne Elggren, a certified public accountant employed by Main Hurdman, disclosing the principal known assets of and claims against the debtor's estate, which is summarized as follows:

Liabilities

| | | |
|---|---|---|
| (1) | Claims of Creditors Secured by Liens on Property of the Debtor | $ 5,713,000.00 |
| (2) | Administrative Expense Claims | $22,086,979.00* |

*(This does not include unpaid rent expenses or the $7,500,000.00 administrative expense claim of the Central States Funds for withdrawal liability)

| | | |
|---|---|---|
| Total Secured or Administrative Claims | | $27,799,979.00 |

Assets

| | | |
|---|---|---|
| (1) | Cash | $ 859,136.00 |
| (2) | Accounts Receivable | $11,582,231.00* |

*(This includes anticipated recoveries from preference and freight undercharge litigation as well as other collection actions)

| | | |
|---|---|---|
| (3) | Real Property | $ 6,120,000.00 |
| (4) | Other Assets | $ 25,000.00 |
| Total Assets | | $18,586,367.00 |

The accountant also estimated expenses for November and December at $350,000.00 and administrative expenses for the first half of 1985 at $970,000.00.

mittee, representing current and former IML employees, made a succinct argument for pro rata distribution among all administrative claimants. "The Court can reasonably do two things: pay everybody or pay nobody."

The Court again took the matter under advisement, and after careful consideration, renders its decision as follows.

## DISCUSSION

In spite of its view that the estate will not yield sufficient assets to satisfy all expenses of administration of both the Chapter 11 case and the superseding Chapter 7 case, the trustee asks the Court to authorize immediate payment in full of fees and expenses incurred by its attorneys and accountants while the case was in Chapter 11. The trustee insists that professional persons which it employed are entitled to payment in full and are not subject to a proration of their Chapter 11 expenses if there are insufficient assets to pay all administrative claims in full. The precise question raised is whether and to what extent the Court should now authorize payment of the Chapter 11 professional fees. To answer this question the Court must consider the nature of the administrative expense priority in bankruptcy.

### Historical Overview

The Bankruptcy Act of 1800, 2 Stat. 19, Ch. 19 (April 4, 1800) (repealed Dec. 19, 1803), the first legislation enacted pursuant to Article I, Section 8, Clause 4 of the Constitution, (the "bankruptcy clause"), did not provide a comprehensive scheme of priorities. Section 31 of the Act provided for pro rata distribution of the debtor's assets among all of his creditors, without regard to whether claims were secured or unsecured. Debts due to the United States, however, enjoyed a priority, *id.* § 62, and, although the mode of administration differed widely from present law, administrative expenses were granted a priority. *Id.* § 29.[22] *See generally* 3A COLLIER ON BANKRUPTCY ¶ 64.01[1], at 2046–47 (14th ed. 1975).

The second national bankruptcy act, the Act of 1841, 5 Stat. 440, Ch. 9 (Aug. 19, 1841) (repealed March 3, 1843), provided that all creditors with allowed claims against the debtor "shall be entitled to share in the bankrupt's property and effects, pro rata, without any priority or preference whatsoever," but created an exception for three priority classes: (1) debts due to the United States; (2) debts due to sureties; and (3) debts owing for labor performed within six months of bankruptcy up to $25.00. *Id.* § 5. The Act did not expressly confer a priority to the expenses of administration, but provided that district courts could prescribe tariffs or tables of fees and charges to be taxed for services rendered in connection with the bankruptcy proceeding. *Id.* § 6. *See generally* 3A COLLIER ON BANKRUPTCY, *supra*, at 2047.

The Act of 1867, 14 Stat. 517, Ch. 176 (March 2, 1867) (repealed June 7, 1878), in contrast, contained a comparatively elaborate priority scheme. The Act provided that creditors would select an assignee to whom title to all of the assets of the debtor's estate would vest. *Id.* §§ 13, 14. The assignee was entitled to a statutory allowance for his services based on a percentage of moneys received and paid out by him. *Id.* § 28. Creditors with allowed claims were entitled to share pro rata in the distribution of the estate. *Id.* § 27. Prior to payment of a dividend, however, five

---

**22.** Section 29 of the Bankruptcy Act of 1800 provided in pertinent part as follows:

[A]nd upon every such meeting [to make a dividend from the debtor's estate], the assignee or assignees shall produce to the commissioners and creditors then present, fair and just accounts of all his or their receipts and payments, touching the bankrupt's estate and effects, and of what shall remain outstanding, and the particulars thereof, ... and in such accounts, the said assignee or assignees shall be allowed and retain all such sum and sums of money, as they shall have paid or expended in suing and prosecuting the commission, and all other just allowances on account of, or by reason or means of their being assignee or assignees. ...

classes of priority claims were required to be paid in full, as follows:

First. The fees, costs, and expenses of suits, and the several proceedings in bankruptcy under this act, and for the custody of property, as herein provided.

Second. All debts due to the United States, and all taxes and assessments under the laws thereof.

Third. All debts due to the State in which the proceedings in bankruptcy are pending, and all taxes and assessments made under the laws of such State.

Fourth. Wages due to any operative, clerk, or house servant, to an amount not exceeding fifty dollars, for labor performed within six months next preceding the first publication of the notice of proceedings in bankruptcy.

Fifth. All debts due to any persons who, by the laws of the United States, are or may be entitled to a priority or preference, in like manner as if this act had not been passed: *Always provided,* That nothing contained in this act shall interfere with the assessment and collection of taxes by the authority of the United States or any State.

*Id.* § 28. Thus, the concept of a first priority for administrative expenses originated with the 1867 Act.

The Act of 1898, 30 Stat. 544, Ch. 541 (July 1, 1898) (repealed Oct. 1, 1979), as amended, was the last national bankruptcy act prior to the current Bankruptcy Code.[23] The pattern of priority established by the 1867 Act, with significant changes, was retained. *See generally,* COLLIER ON BANKRUPTCY, *supra,* ¶ 64.01[2.1], at 2047. As originally enacted, Section 64 of the Bankruptcy Act, former 11 U.S.C. § 104, provided in pertinent part:

Sec. 64. DEBTS WHICH HAVE PRIORITY.—a. The court shall order the trustee to pay all taxes legally due and owing by the bankrupt to the United States, State, county, district, or municipality in advance of the payment of divi-

dends to creditors, and upon filing the receipts of the proper public officers for such payment he shall be credited with the amount thereof, and in case any question arises as to the amount or legality of any such tax the same shall be heard and determined by the court.

b. The debts to have priority, except as herein provided, and to be paid in full out of bankrupt estates, and the order of payment shall be (1) the actual and necessary cost of preserving the estate subsequent to filing the petition; (2) the filing fees paid by creditors in involuntary cases; (3) the cost of administration, including the fees and mileage payable to witnesses as now or hereafter provided by the laws of the United States, and one reasonable attorney's fee, for the professional services actually rendered, irrespective of the number of attorneys employed, to the petitioning creditors in involuntary cases, to the bankrupt in involuntary cases while performing the duties herein prescribed, and to the bankrupt in voluntary cases, as the court may allow; (4) wages due to workmen, clerks, or servants which have been earned within three months before the date of the commencement of proceedings, not to exceed three hundred dollars to each claimant; and (5) debts owing to any person who by the laws of the States or the United States is entitled to priority.

Section 64 was amended three times prior to 1938.[24] The Chandler Act, 52 Stat. 840 (June 22, 1938), was the last major amendment of the 1898 Bankruptcy Act, prior to its repeal in 1979. Section 64 was materially changed. As amended, Subdivision *a* described more elaborately than prior legislation a comprehensive priority scheme. Section 64a provided:

Sec. 64. Debts Which Have Priority.—a. The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of

---

**23.** Pub.L. 95–598, 92 Stat. 2549 (Nov. 6, 1978).

**24.** Acts of February 5, 1903, 32 Stat. 797; June 15, 1906, 34 Stat. 267; May 27, 1926, 44 Stat. 662.

bankrupt estates, and the order of payment, shall be (1) the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition; the filing fees paid by creditors in involuntary cases; where property of the bankrupt, transferred or concealed by him either before or after the filing of the petition, shall have been recovered for the benefit of the estate of the bankrupt by the efforts and at the cost and expense of one or more creditors, the reasonable costs and expenses of such recovery; the costs and expenses of administration, including the trustee's expenses in opposing the bankrupt's discharge, the fees and mileage payable to witnesses as now or hereafter provided by the laws of the United States, and one reasonable attorney's fee, for the professional services actually rendered, irrespective of the number of attorneys employed, to the petitioning creditors in involuntary cases and to the bankrupt in voluntary and involuntary cases, as the court may allow; (2) wages, not to exceed $600 to each claimant, which have been earned within three months before the date of the commencement of the proceeding, due to workmen, servants, clerks, or traveling or city salesmen on salary or commission basis, whole or part time, whether or not selling exclusively for the bankrupt; (3) where the confirmation of an arrangement or wage-earner plan or the bankrupt's discharge has been refused, revoked, or set aside upon the objection and through the efforts and at the cost and expense of one or more creditors, or, where through the efforts and at the cost and expense of one or more creditors, evidence shall have been adduced resulting in the conviction of any person of an offense under this Act, the reasonable costs and expenses of such creditors in obtaining such refusal, revocation, or setting aside, or in adducing such evidence; (4) taxes legally due and owing by the bankrupt to the United States or any State or any subdivision thereof: *Provided,* That no order shall be made for the payment of a tax assessed against any property of the bankrupt in excess of the value of the interest of the bankrupt estate therein as determined by the court: *And provided further,* That, in case any question arises as to the amount or legality of any taxes, such question shall be heard and determined by the court; and (5) debts owing to any person, including the United States, who by the laws of the United States i[s] entitled to priority, and rent owing to a landlord who is entitled to priority by applicable State law: *Provided, however,* That such priority for rent to a landlord shall be restricted to the rent which is legally due and owing for the actual use and occupancy of the premises affected, and which accrued within three months before the date of bankruptcy.

Under the 1938 ·amendments, costs of administration, which had enjoyed a first priority under the 1867 Act but dropped to a third priority under the 1898 Act, were reinstated at first position. The costs and expenses catalogued at Section 64a(1) were entitled to be paid on a pro rata basis with one another if funds were insufficient to pay all in full. *See* 3A COLLIER ON BANKRUPTCY, *supra,* ¶ 64.02[4], at 2070.

By lumping together "the actual and necessary costs and expenses of preserving the estate" with "the costs and expenses of administration" as first priority expenses under Section 64a(1), Congress created a dilemma whenever a debtor rehabilitation case was followed by a liquidation case and the assets were insufficient to pay the administration expenses of both in full. Consequently, all costs and expenses of administration, whether incurred during the reorganization period or during the liquidation period, were required to share pro rata in the funds available for payment. *See, e.g., United States v. Killoren,* 119 F.2d 364, 366 (8th Cir.), *cert. denied,* 314 U.S. 640, 62 S.Ct. 78, 86 L.Ed. 513 (1941); *In re Columbia Ribbon Co.,* 117 F.2d 999, 1001 (3rd Cir.1941); *State of Missouri v. Earhart,* 111 F.2d 992, 995 (8th Cir.), *cert. denied,* 311 U.S. 676, 61 S.Ct. 43, 85 L.Ed. 435

(1940; *In re Lambertville Rubber Co.*, 111 F.2d 45, 50 (3d Cir.1940).

In 1952, Congress amended Section 64a(1) by adding the following proviso: *Provided, however,* That where an order is entered in a proceeding under any chapter of this Act directing that bankruptcy be proceeded with, the costs and expenses of administration incurred in the ensuing bankruptcy proceeding shall have priority in advance of payment of the unpaid costs and expenses of administration, including the allowances provided for in such chapter, incurred in the superseded proceeding and in the suspended bankruptcy proceeding, if any; [....]

Pub.L. 82–456, 66 Stat. 426 (July 7, 1952).[25]

The purpose for the 1952 amendment to Section 64a is set forth in its legislative history, as follows:

The final proviso added to this clause changes the rule that, where bankruptcy follows a debtor-relief proceeding and the fund for distribution is not sufficient to pay the administration costs and expenses of both proceedings, the costs and expenses of both proceedings shall share pro rata and on a parity. *In re Columbia Ribbon Company*, 45 Am.B.R. (N.S.) 528 (C.C.A.3d); *United States v. Killoren*, 45 Am.B.R. (N.S.) 808 (C.C.A.8th). Unless provision is made for payment, ahead of all prior incurred and unpaid administration costs and expenses, of the costs and expenses necessary to administer and close the estate in the ensuing bankruptcy proceeding, there is always danger of a breakdown of administration. There should be assurance to the trustee in the ensuing bankruptcy proceeding that the costs and expenses incurred by him, such as bond premiums, insurance premiums, costs of conducting a public sale, and compensation for his services and for the services of his attorney out of the assets turned over to and administered by him, will be paid ahead of the prior unpaid costs and expenses. Unless thus assured, he cannot be expected to function effectively.

**25.** This amendment, in turn, created confusion of its own. The language of the proviso gave superpriority status only to the "costs and expenses of administration" incurred in the liquidation case over "the unpaid costs and expenses of administration" of the reorganization case, and not over other expenses incurred in preserving the assets of the estate. *See.* S.Rep. No. 1954, 87th Cong., 2d Sess. (Aug. 28, 1962), 1962 U.S.Code Cong. & Admin.News, pp. 2603, 2607. Therefore, in order to clarify the 1952 amendment and extend the superpriority over *all* preservation expenses, Congress amended clause (1) of subsection *a* of Section 64 in 1962 to provide as follows:

> (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition; the fees for the referees' salary and expense fund; the filing fees paid by creditors in involuntary cases or by persons other than the bankrupts in voluntary cases; where property of the bankrupt, transferred or concealed by him either before or after the filing of the petition, is recovered for the benefit of the estate of the bankrupt by the efforts and at the cost and expense of one or more creditors, the reasonable costs and expenses of the recovery; the trustee's expenses in opposing the bankrupt's discharge or in connection with the criminal prosecution of an offense punishable under chapter 9 of title 18 of the United States Code, or an offense concerning the business or property of the bankrupt punishable under other laws, Federal or State; the fees and mileage payable to witnesses as now or hereafter provided by the laws of the United States, and one reasonable attorney's fee, for the professional services actually rendered, irrespective of the number of attorneys employed, to the bankrupt in voluntary and involuntary cases, and to the petitioning creditors in involuntary cases, and if the court adjudges the debtor bankrupt over the debtor's objection or pursuant to a voluntary petition filed by the debtor during the pendency of an involuntary proceeding, for the reasonable costs and expenses incurred, or the reasonable disbursements made, by them, including but not limited to compensation of accountants and appraisers employed by them, in such amount as the court may allow. Where an order is entered in a proceeding under any chapter of this Act directing that bankruptcy be proceeded with, the costs and expenses of administration incurred in the ensuing bankruptcy proceeding shall have priority in advance of payment of the unpaid costs and expenses of administration, including the allowances provided for in such chapter, incurred in the superseded proceeding and in the suspended bankruptcy proceeding, if any; [....]

Pub.L. 87–681, 76 Stat. 571 (Sept. 25, 1962).

The Judicial Conference has also approved the modification of the present rules (Report of Judicial Conference, October 1946, p. 15) although it would permit priority to the subsequent proceeding to be decided in each case by the court. The necessities of bankruptcy administration appear to make a statutory priority preferable.

H.R.Rep. No. 2320, 82d Cong., 2d Sess. 9–10 (1952), 1952 U.S.Code Cong. & Admin. News, pp. 1960, 1969–70; S.Rep. No. 1395, 82d Cong., 2d Sess. 4–5 (1952). *See also New York Credit Men's Adjustment Bureau, Inc. v. A. Jesse Goldstein & Co.,* 276 F.2d 886, 889 (2d Cir.1960); *In re Univirsal Table Top Co., Inc.,* 10 B.R. 706, 709 (Bkrtcy.E.D.N.Y.1981). Since enactment of the 1952 amendment to Section 64a, administrative expenses in a liquidation case have always enjoyed a statutory priority ahead of the unpaid administrative expenses of a superseded rehabilitation case. *Matter of Minskoff-Dorman Co.,* 444 F.2d 516, 517 (9th Cir.1971).

The drafters of the 1978 Bankruptcy Code modified the priorities previously established without departing significantly from the underlying policy. Section 726(b) follows former Section 64a(1) and specifies that the administrative expenses of a superseding Chapter 7 have a superpriority over the administrative expenses of the Chapter 11 case. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 383 (1977), 1978 U.S. Code Cong. & Admin.News, pp. 5787, 6339. The reason is obvious. "Those who must wind up the affairs of a debtor's estate must be assured of payment, or else they will not participate in the liquidation or distribution of the estate." *Id.* at 186–87, 1978 U.S.Code Cong. & Admin.News, p. 6147. *Cf.* H.R.Rep. No. 2320 and Senate Rep. No. 1395, *supra.*[26]

*The Relationship Between Sections 507(a)(1) and 726(b)*

Section 507(a) establishes seven categories of expenses and claims entitled to priority. Professional compensation and reimbursement of expenses awarded under Sections 330 and 331 are administrative expenses under Section 503(b)(2), which have first priority in distribution pursuant to Section 507(a)(1).

It would be well to pause a moment here to take notice of two principles embodied in Sections 507(a)(1) and 726(b). The first is that all administrative expenses incurred under Chapter 11 are on a statutory parity with one another as to right to payment. 11 U.S.C. §§ 503(b), 507(a)(1). *See United States v. Kalishman,* 346 F.2d 514, 517 (8th Cir.1965) *cert. denied* 384 U.S. 1003, 86 S.Ct. 1913, 16 L.Ed.2d 1017 (1966); *State of Missouri v. Earhart, supra,* 111 F.2d at 992; *In re Lambertville Rubber Co.,* 27 F.Supp. 897, 901 (D.N.J.1939), *modified, In re Lambertville Rubber Co., supra,* 111 F.2d at 45; *In re Western Farmers Association, supra,* 13 B.R. at 134; 1 W. Norton, BANKRUPTCY LAW AND PRACTICE § 12.03, at Pt. 12—p. 5 (1981). The other is that if a Chapter 11 case is converted to a case under Chapter 7, Section 726(b) provides a superpriority for administrative expenses incurred after conversion, and if there are insufficient funds to pay all of the Chapter 11 administrative expenses in full, all claimants must share pro rata in the available funds.[27] *See In re Penn-Mahoning Mining, Inc.,* 45 B.R. 51,

---

**26.** Since Section 726(b) is essentially a recodification of the 1952 amendment to former Section 64a(1), prior case law is useful in interpreting the new provision. *See In re Blanton-Smith Corp.,* 44 B.R. 73, 76, 12 B.C.D. 525 (Bkrtcy.M.D. Tenn.1984).

**27.** Section 726(b) provides:
(b) Payment on claims of a kind specified in paragraph (1), (2), (3), (4), (5), or (6) of section 507(a) of this title, or in paragraph (2), (3), (4), or (5) of subsection (a) of this section, shall be made pro rata among claims of the kind specified in each such particular paragraph, except that in a case that has been converted to this chapter under section 1112 or 1307 of this title, a claim allowed under section 503(b) of this title incurred under this chapter after such conversion has priority over a claim allowed under section 503(b) of this title incurred under any other chapter of this title or under this chapter before such conversion and over any expenses of a custodian superseded under section 543 of this title.

52, 12 B.C.D. 470 (Bkrtcy.M.D.Penn.1984); *In re Thomas Solvent Co.*, 44 B.R. 83, 87–88 (Bkrtcy.W.D.Mich.1984); *In re Blanton-Smith Corp., supra,* 44 B.R. at 75; *In re Nordyke,* 43 B.R. 856, 864 (Bkrtcy.D. Ore.1984); *In re Four Star Terminals, Inc., supra,* 42 B.R. at 440; *In re Burlington Tennis Associates,* 34 B.R. 839, 841 (Bkrtcy.D.Vt.1983); *In re Lambdin,* 33 B.R. 11, 13, 11 B.C.D. 103 (Bkrtcy.M.D. Tenn.1983); *In re Manchester Hides, Inc.,* 32 B.R. 629, 630 n. 2, 11 B.C.D. 969 (Bkrtcy. N.D.Iowa 1983); *In re Higgins,* 29 B.R. 196, 199, 11 B.C.D. 7 (Bkrtcy.N.D. Iowa 1983); *In re New England Carpet Co.,* 28 B.R. 766, 770 (Bkrtcy.D.Vt.), *aff'd,* 38 B.R. 703 (D.Vt.1983), *aff'd,* 744 F.2d 16 (2d Cir.1984); *In re Vermont Real Estate Investment Trust,* 26 B.R. 905, 906, 10 B.C.D. 147 (Bkrtcy.D.Vt.1983); *In re Charlie Altman Pontiac-Cadillac-GMC, Inc.,* 23 B.R. 50, 51 (Bkrtcy.N.D.Ala.1982); *In re Price Chopper Supermarkets, Inc.,* 19 B.R. 462, 467, 8 B.C.D. 1263 (Bkrtcy.S.D. Cal.1982); *In re Chugiak Boat Works, Inc.,* 18 B.R. 292, 296 n. 6, 8 B.C.D. 1000 (Bkrtcy.D.Alaska 1982); *In re Codesco, Inc.,* 18 B.R. 225, 226, 8 B.C.D. 1089 (Bkrtcy.S.D.N.Y.1982); *Matter of Robin Industries, Inc.,* 16 B.R. 695, 697 (Bkrtcy. N.D.Ga.1982); *In re National Buy-Rite, Inc.,* 10 B.R. 380, 381, 7 B.C.D. 740 (Bkrtcy. N.D.Ga.1981); *In re George C. Frye Co.,* 7 B.R. 856, 858, 7 B.C.D. 120 (Bkrtcy.D.Me. 1980); 1 W. Norton, BANKRUPTCY LAW AND PRACTICE, *supra,* at § 12.03.

These principles have perhaps been insufficiently considered by the trustee. Counsel for the trustee brushes aside the arguments by other Chapter 11 administrative claimants for equality of treatment by referring merely to the "preeminence" of professional fees recognized by this Court in *In re Callister, supra.* The trustee invites the Court's attention to the following excerpt from that decision:

Fees are allowed under 11 U.S.C. Section 330 and classified as administrative expenses under 503(b)(2). But while other administrative expenses must wait until confirmation, 11 U.S.C. Section 1129(a)(9), or liquidation, 11 U.S.C. Section 726, for reimbursement, fees are payable on an interim and therefore a preeminent basis under 331. Not only the statutory scheme but also reasons of policy support this preeminence of fees under 331.

15 B.R. at 534 (footnotes omitted).[28]

Unfortunately, the trustee omits some rather significant language demonstrating that payment of interim compensation is discretionary with the Court and its appropriateness depends upon the particular circumstances of each case:

These dangers do not dictate that in every instance fees must be paid ahead of the superpriority. Section 331 says that fees "may" be paid on an interim basis. There is a presumption, for the reasons outlined above, that they will be paid notwithstanding the existence of a superpriority. This presumption may be strengthened, for example, where a trustee or his representative who is requesting fees was installed at the behest of a creditor entitled to a superpriority. *Cf. In re Hotel Associates, Inc.,* 6 B.R. 108, 114 (Bkrtcy.E.D.Pa.1980). But it is rebuttable under appropriate equitable circumstances. *Cf.* 2 Collier on Bankruptcy, *supra* ¶ 331.01 at 331–3 ("The genesis of interim compensation is rooted in the equity powers of the bankruptcy court"). These circumstances, however, are not present in this case.

*Id.* at 535.

The word "preeminence" is susceptible to misunderstanding. *Callister* is best understood if viewed simply as authority for three propositions:

---

**28.** In the trustee's memorandum, the *Callister* holding is described as follows: "In particular, the Court held that professional fees are 'preeminent' and may take precedence over a creditor's superpriority under Section 507(b) of the Bankruptcy Code." Memorandum in Support of Trustee's Motion for an Order Permitting Payment of Allowed Professional Fees, at 13 (Nov. 15, 1984).

(1) Unlike some other administrative expenses, which may await plan confirmation or liquidation, professional fees may be allowed and paid on an interim basis.[29]

(2) There is a judicial presumption favoring payment of all allowed interim compensation.[30]

(3) The presumption may be rebutted by a proper showing of countervailing equitable considerations.[31]

Neither the statute, its legislative history and policy, nor the foregoing principles distilled from *Callister*, support the proposition that in a superseding Chapter 7 case the professional fees previously incurred during the Chapter 11 case are entitled to be paid in full ahead of other Chapter 11 administrative claimants and without proration in the event of a shortfall.

The Court must now consider whether it can create a special priority for professional fees over other Chapter 11 expenses. Although some of the older cases held that bankruptcy courts, in the exercise of their equitable powers, could fashion priorities within the administrative expense category,[32] the majority and better view, and the unanimous view of the later cases, was that courts were without the power or discretion to create a scale of priorities among administrative claims, and if the estate had insufficient funds to pay all claims in full, claimants must share pro rata among the available assets.[33]

Priorities under the Bankruptcy Code are a creature of statute. *See* 11 U.S.C. §§ 364(b) and (c), 503(b), 507(a), 546(c), and 726(b); *In re Chicago Express, Inc.*, 332 F.2d 276, 278 (2d Cir.), *cert. denied* 379 U.S. 879, 85 S.Ct. 146, 13 L.Ed.2d 86 (1964). Had Congress wanted the bankruptcy courts to fashion their own priorities for distribution of assets, it might have omitted Sections 364, 507, and 726 from the Code. Instead, the Bankruptcy Reform Act of 1978, as each of its more recent predecessors, contained an elaborate scheme of priorities. The Court does not have the prerogative to flout those priorities.

Having thus determined that professional fees are on a parity with other Chapter 11 administrative expenses as to *right* to payment, the Court turns now to the ques-

---

**29.** *In re Callister, supra,* 15 B.R. at 534. The legislative history to Section 331 says essentially the same thing:

> Section 331 permits trustees and professional persons to apply to the court not more than once every 120 days for interim compensation and reimbursement payments. The court may permit more frequent applications if the circumstances warrant, such as in very large cases where the legal work is extensive and merits more frequent payments. The court is authorized to allow and order disbursement to the applicant of compensation and reimbursement that is otherwise. allowable under section 330. The only effect of this section is to remove any doubt that officers of the estate may apply for, and the court may approve, compensation and reimbursement during the case, instead of being required to wait until the end of the case, which in some instances, may be years. The practice of interim compensation is followed in some courts today, but has been subject to some question. This section explicitly authorizes it.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 330 (1977), 1978 U.S.Code Cong. & Admin.News, p. 6287, S.Rep. No. 95–598, 95th Cong., 2d Sess. 41–42 (1978), 1978 U.S.Code Cong. & Admin. News, pp. 5827–28.

**30.** A number of judicial presumptions in bankruptcy and their evidentiary effect (but not the presumption of payment of interim compensation) are discussed by Judge Russell in "To Presume or Not to Presume—That is the Question," 5 Norton Bankruptcy Law Adviser 1–5 (May, 1985).

**31.** *In re Callister, supra* note 10, at 535.

**32.** *E.g., In re Almanaris Mineral Spring Co.*, 36 F.Supp. 958 (E.D.Wis.1941); *In re Automotives Co.*, 7 F.Supp. 614, 616 (N.D.Ohio 1922).

**33.** *E.g., In re REA Express, Inc.*, 442 F.Supp. 71, 74 (S.D.N.Y.1977), *aff'd* 591 F.2d 1332 (2d Cir.1978); *Thomas Corporation v. Nicholas*, 221 F.2d 286, 289 (5th Cir.1955); *In re Delaware Hosiery Mills*, 202 F.2d 951, 953 (3d Cir.1953); *United States v. Killoren, supra,* 119 F.2d at 366; *State of Missouri v. Earhart, supra,* 111 F.2d at 994–95; *In re Columbia Ribbon Co., supra,* 117 F.2d at 1001; *In re M.K.C. Cafeteria, Inc.*, 47 F.Supp. 14, 15 (E.D.N.Y.1942); *In re Ehrlich*, 3 F.2d 62, 64 (E.D.Pa.1924); *In re Wilnor Drilling, Inc.*, 29 B.R. 727, 729, 10 B.C.D. 457 (S.D.Ill.1982).

tion of the *timing* of payment. The rule that all administrative claimants be treated alike in the event that there are insufficient assets to pay each claimant in full does not necessarily require that all receive satisfaction of their claims at the same time. *See In re Western Farmers Association,* 13 B.R. 132, 134–35, 7 B.C.D. 1214, 1215 (Bkrtcy.W.D.Wash.1981). *Cf. Home Indemnity Company v. F.H. Donovan Painting Co.,* 325 F.2d 870, 876 (8th Cir. 1963) ("the Act does not establish inexorable rules for distribution which can never be deviated from in the interest of justice and equity"); *In re American Resources Management Corp.,* 51 B.R. 713 (Bkrtcy.D. Utah 1985).

Since neither the Bankruptcy Code nor the Rules prescribe the time for payment of administrative claims under Section 726(b), the Court shall consider equitable and policy factors in making its decision. In this case, those factors may be broadly categorized as the allocation of risk, and proration problems and prejudice to other claimants.

*Allocation of Risk.* The concerns which spurred the trustee to seek payment of Chapter 11 professional fees are legitimate and serious. The trustee's accountants and attorneys, unlike the attorneys for the debtor in possession, received no retainer, but have looked exclusively to interim allowances under Section 331. In this Court's view, the *Callister* presumption in favor of payment is at its strongest under these circumstances. Since their retention, these professionals have received only one-fourth of the fees earned while the case was in Chapter 11. Thus, to a significant degree and for a prolonged period, they have been "forced to finance [the] case...." 2 COLLIER ON BANKRUPTCY ¶ 331.02, at 331–6 to 331–7 (15th ed. 1985). This is certainly the quintessence of the trustee's argument for payment ahead of other Chapter 11 administrative claimants.

The uncertainties inherent in Chapter 11 cases are only too familiar. Many cases are filed, many fail. It is quite obvious that an attorney or other professional employed by a trustee in a Chapter 11 case must accept the risk that there will be insufficient assets to satisfy administrative claims in full, and the risk of subordination of his or her claim if the case is converted to Chapter 7. Experience under the Code has shown that professional persons have been willing to assume those risks and the bankruptcy practice is continuing to grow and to attract highly capable individuals.

In this case, the trustee has been required to make numerous difficult and complex decisions. Perhaps the most baffling decision to the Court, in the light of subsequent events, was the decision to refrain from moving to convert the case to Chapter 7 for more than six months after terminating the debtor's business and commencing liquidation of its assets. Although there may be sound reasons for the delay, they have not been presented to the Court and are irrelevant. Professional fees incurred while liquidating under Chapter 11 do not enjoy priority over other Chapter 11 administrative expenses when a case is converted to Chapter 7. *In re Codesco, supra,* 18 B.R. at 227–28. This Court has previously allowed conversion to Chapter 7 for the sole purpose of assuring that professional persons employed by the Chapter 11 trustee in liquidating the estate would have a higher priority for their claims than other administrative claimants. *In re Executive Air Services, Inc.,* No. 83C–00795, transcript of ruling (Bkrtcy.D.Utah July 31, 1984). Since conversion to Chapter 7, the professional persons employed by the trustee have been allowed to file interim fee applications every 60 days and are being paid all allowed compensation.

*Proration Problems and Prejudice to Other Claimants.* Attorneys and other professionals employed in bankruptcy cases, although they put in many hours of painstaking, careful, and meritorious services, as in this case, must accept that when they are to be compensated out of funds of the estate, the Court will take into account the affect of such payment on other administrative claimants, which enjoy

the same priority. *See Matter of Robin Industries, supra,* 16 B.R. at 697. The essential fact to be considered in connection with the trustee's motion for payment is the certainty—not merely the possibility—that there will be insufficient assets to pay all costs of administration. The question is whether the Court should now, in the face of the estate's certain inability to pay all Chapter 11 administrative expenses in full, authorize full payment to the trustee's accountants and attorneys, and the other Chapter 11 professionals, knowing that some measure of such fees will have to be repaid in order to effect a pro rata distribution with other claimants.

Bankruptcy courts generally have been unwilling to allow full payment of administrative claims where there is a likelihood that there will be insufficient funds to pay all claimants in full and proration is necessary. *See, e.g., In re National Buy-Rite, Inc., supra,* 10 B.R. at 381; *In re Western Farmers Association, supra,* 13 B.R. at 135; *Matter of Robin Industries, supra,* 16 B.R. at 697; *Matter of Codesco, Inc., supra,* 15 B.R. 354 at 355 (Bkrtcy.S.D.N.Y. 1981); *In re First Hartford Corp.,* 23 B.R. 729, 732 (Bkrtcy.S.D.N.Y.1982); *In re Four Star Terminals, Inc., supra,* 42 B.R. at 440; *In re Vermont Real Estate Investment Trust, supra,* 26 B.R. at 906–08. This judicial reticence is even greater where, as here, the Chapter 11 case has already been converted to Chapter 7. *See In re Charlie Altman Pontiac-Cadillac-GMC, Inc., supra,* 23 B.R. at 51.

█ The Court does not favor payment of administrative expenses subject to repayment of part of such sums received if there are insufficient funds to pay other claimants. *Cf. In re Burlington Tennis Associates, supra,* 34 B.R. at 841. Where there is a substantial doubt that there will be sufficient assets for the payment of all administrative expenses in full, the Court will authorize payment of only such an amount "as would almost certainly be allowed the applicant under all possible contingencies." *See In re Coconut Grove Bayshore, Inc.,* 33 B.R. 194, 195 (Bkrtcy.S.D.Fla.1983). The burden is on the applicant to show how much should be paid as an interim allowance.

█ Until the approximate amount of the Chapter 11 and Chapter 7 administrative claims is known, it is virtually impossible to determine correctly the percentage of payment the Chapter 11 professionals should receive. The difficulty, expense, and delay of making a determination of all allowable Chapter 11 administrative expense claims does not justify subordinating such claims to those of the professional persons. The trustee has not provided the Court with a "best case" and "worst case" analysis or other evidence to establish the entitlement the Chapter 11 professional persons to more than the 25% previously allowed. In the absence of a convincing presentation of such evidence, the Court will not allow professional persons to be paid ahead of the other Chapter 11 administrative claimants.[34]

### CONCLUSION

"Compensation is the lubricant which makes the bankruptcy machinery work when applied in the proper places in the proper amount."[35] It is fitting for everyone to try to put his own financial house in order. Hence the mission of the trustee in this proceeding is not an abstract or theoretical one, but a practical one. This pragmatic concern for payment of fees that have been earned and fully deserved is not unbecoming. The Court recognizes that

---

**34.** It has been noted that the aggregate value of the estate's assets and the claims against them are more readily determined in a liquidation case than in the context of a rehabilitation case.

*See Matter of Penn Central Transportation Co.,* 596 F.2d 1102, 1111 (3d Cir.1979).

**35.** *Matter of King Resources Co.,* 651 F.2d 1349, 1352 (10th Cir.), *cert. denied sub nom. Citibank,*

the law is both a profession and a business.[36]

The trustee has shown that upon complete liquidation there will be insufficient funds to satisfy all administrative claims, much less for any distribution to unsecured creditors. Section 726(b) of the Bankruptcy Code is intended to assure that those whose services are necessary to liquidate the debtor's assets be fully compensated. Professional persons who performed services during the Chapter 11 case are on a parity with other Chapter 11 administrative claimants and must share pro rata among the remaining funds.

Several years have now elapsed since this Court rendered its decision in the *Callister* case, but upon review of that case in the light of numerous later decisions, the Court remains convinced that it was correctly decided. The standards of fairness and equity, recognized in *Callister* to be at the heart of the principle of interim compensation, permit the Court in its discretion to authorize payment to professional persons ahead of other administrative and superpriority claimants. The appropriate exercise of that discretion will necessarily depend upon the facts and circumstances of each case and may not impair the rights of equal or senior priority claimants to payment.

In the present posture of this case, it is clear that the trustee's motion for immediate payment of all allowed professional fees must be denied. The total administrative claims arising during the Chapter 11 case are unknown, as are the administrative expenses of the pending Chapter 7 case. Much more information is needed before a final decision can be made. It may well be that the trustee can show the Court that even under a "worst case" analysis, the Chapter 11 claimants will receive

more than 25% of their claims. The trustee will be allowed to present evidence on this point.

For the foregoing reasons and upon the authorities cited, the Court is of the opinion that it would be inappropriate to allow the present payment in full of the Chapter 11 professional fees.

---

N.A. v. Phoenix Resources Co., 454 U.S. 881, 102 S.Ct. 370, 70 L.Ed.2d 195 (1981).

**36.** *Cf. In re Grady,* 4 B.C.D. 559, 560 (Bkrtcy.S.D. Iowa 1978), in which Judge Stageman wrote:
The dominant note of such a professional undertaking should be service first and reward second. The court is of the firm belief that counsel recognized that when they made a voluntary decision to accept employment by the debtors they would be "in some degree compensated for their labor, and time spent in anxious search for knowledge, by the respect and regard entertained for them generally, and by the opportunities so often afforded of impressing on the age in which they live the spirit and genius which animate them." (citation omitted).