**In re ENERGY COOPERATIVE, INC., Debtor.**

**Bankruptcy No. 81 B 05811.**

United States Bankruptcy Court, N.D. Illinois, E.D.

Dec. 30, 1985.

MEMORANDUM OPINION
AND ORDER

FREDERICK J. HERTZ, Bankruptcy Judge.

## I.

This case comes to be heard on several applications and objections thereto, raising related, troublesome issues of law. Each application involves a request for payment of interim compensation to professionals previously or presently involved in the administration of the *Energy Cooperative, Inc.* ("ECI") case and related proceedings. Said applications are made by the following firms: (1) Nachman, Munitz & Sweig ("NM & S"), seeking payment of certain compensation and reimbursement of expenses pre-

viously allowed[1] in the amount of $394,-344.87 for services rendered as attorney for the debtor-in-possession in the chapter 11 case;[2] (2) Schwartz, Cooper, Kolb & Gaynor, Chartered ("SCK & G") for certain compensation and reimbursement of expenses previously allowed[3] in the amount of $505,068.28 for services rendered as attorneys for the Official Unsecured Creditors' Committee in connection with the chapter 11 case; (3) Miller, Shakman, Nathan & Hamilton ("MSN & H"), for certain compensation and reimbursement of expenses allowed[4] in the amount of $117,-193.49 for services rendered as attorneys for the Trustee in connection with the chapter 7 case; (4) Hannafan & Handler, Ltd. ("H & H"), for certain compensation and reimbursement of expenses previously allowed[5] in the amount of $20,203.75 for services rendered as attorneys for the Trustee in connection with the chapter 7 case; and (5) Seidman & Seidman ("S & S"), for certain compensation and reimbursement of expenses previously allowed[6] in the amount of $265,852.53 for services rendered as accountants for the Unsecured Creditors' Committee, the debtor-in-possession and the *ECI* estate in connection with both the chapter 11 and chapter 7 cases. There are two objectors to these applications: Continental Illinois National Bank & Trust Company of Chicago ("Continental"),

the agent for the lending banks,[7] and the former Member-Owners[8] of ECI. As is more fully described below, both Continental and the Member-Owners concede that the amounts previously granted as compensation to the various professionals were proper, but contend that there are no available assets in the estate from which to pay those amounts. Having considered in detail the voluminous record, the copious briefs and exhibits, and the engaging oral arguments of counsel, it is incumbent upon this court to decide whether some or all of the previously-allowed fees should now be disbursed on an interim basis, and, if so, from whence the money to pay these fees should come.

## II.

To consider properly the issues raised, an abbreviated recitation of the salient facts, as they appear in the record, is in order. ECI was a cooperative; as such, its Member-Owners were both its owners and its customers. They formed ECI in 1976 for the purpose of assuring themselves petroleum products for their respective agricultural businesses. In furtherance of this purpose, ECI purchased a petroleum refinery from Atlantic Richfield Company ("ARCO") located in East Chicago, Indiana. ARCO held a first mortgage on the site in

---

1. *See* Minute Order, dated August 14, 1985, entered by the Honorable Thomas James.

2. ECI filed for reorganization under chapter 11 of the Bankruptcy Code on May 15, 1981. On May 31, 1984, the chapter 11 case was converted to a liquidation on motion of the debtor-in-possession.

3. *See* Minute Order dated August 14, 1985, entered by the Honorable Thomas James.

4. On May 16, 1985, MSN & H was allowed fees of $82,863.50 and expenses of $2,758.72, and H & H was allowed fees of $12,600. On June 12, 1985 the trustee was authorized to disburse $31,-973.50 in fees and $2,758.72 in expenses to MSN & H, and $2,587.80 to H & H. This left a balance of $50,890 owed to MSN & H for fees, and $10,012.20 to H & H for fees. On September 26, 1985, MSN & H was allowed an additional $63,096 in fees and $3,207.49 in expenses, and H & H was allowed an additional $10,-

106.25 in fees and $85.30 in expenses. These orders left a total of $117,193.49 to be paid MSN & H, and $20,203.75 to be paid H & H.

5. *See* note 4, *supra*.

6. *See* Minute Order dated August 14, 1985, entered by the Honorable Thomas James.

7. Continental is agent for the following banks: First National Bank of Minneapolis, The First National Bank of Boston, Bank of Montreal (California), Seattle First National Bank, First National Bank and Trust Company of Oklahoma City, St. Louis Bank for Cooperatives and the Federal Deposit Insurance Corporation as assignee of Continental.

8. The Member-Owners were: Farmers Union Central, Inc., Farmers Petroleum Coop., Inc., FCX, Inc., Landmark, Inc., Land O' Lakes, Inc., Midland Cooperatives, MFA Oil Co., and Tennessee Farmers Coop.

the amount of $40,000,000 as security for the purchase price. Continental largely financed ECI's operations pursuant to an agreement entered into on September 6, 1978, whereby Continental would loan ECI operating funds in exchange for a security interest in substantially all of ECI's assets, including a second mortgage on the refinery.

The viability of the cooperative was theoretically ensured by "Member Subscription Agreements" and "Member Product Purchase Agreements:" ECI would derive working capital from the former, and have a ready market for its products through the latter. It is alleged that each of these agreements was substantially breached,[9] thereby contributing to ECI's financial deterioration. These alleged circumstances and others, such as the generally depressed condition of the petroleum market at the time, led to ECI filing for reorganization on May 15, 1981. 11 U.S.C. § 1101 *et seq.*

At the time of filing, ECI had approximately $271,652,711 [9a] in assets, $115,792,-847 in unsecured debt, and $294,154,240 in secured debt. It had in excess of 533 creditors, primary among them, ARCO and Continental. ECI, after filing, remained in possession pursuant to applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1108.

On May 21, 1981, shortly after the filing, ECI and Continental entered into a debtor-in-possession financing agreement encaptioned, "ORDER GRANTING APPLICATION BY ENERGY COOPERATIVE, INC., DEBTOR-IN-POSSESSION, (1) FOR AUTHORITY TO ENTER INTO, EXECUTE, PERFORM AND CONSUMMATE CREDIT AGREEMENT AND RELATED DOCUMENTS, (2) FOR AUTHORITY TO INCUR SECURED INDEBTEDNESS, (3) FOR AN ORDER GRANTING PRIORITY TO SECURITY INTEREST AND MORTGAGE PURSUANT TO 11 U.S.C. § 364(c), AND ORDER FIXING TIME, DATE, AND PLACE FOR FURTHER HEARING ON SAID APPLICATION." Similar orders were entered into on subsequent dates to allow continuous financing of the debtor-in-possession. *See, e.g.,* Orders entered by this court on March 1, 1982, April 12, 1982 and January 7, 1983.

NM & S was authorized by this court to act as counsel for the debtor-in-possession.[10] SCK & G was authorized [11] to act as counsel for the Official Unsecured Creditors' Committee.[12] S & S was authorized to act as accountant for the Official Unsecured Creditors' Committee, and also performed work for the debtor-in-possession.[13] Because of the size and complexity of the *ECI* case, each firm was called upon to perform significant amounts of work in connection therewith.

In spite of the substantial efforts of all involved, the *ECI* reorganization did not prove to be viable. The case was converted on motion of the debtor-in-possession to a chapter 7 liquidation on May 31, 1984. Jay A. Steinberg was duly appointed and authorized to act as Trustee of the *ECI* estate.[14] He ultimately retained the firms of MSN & H and H & H to represent him on various matters.[15] The accounting services of S & S were retained to assist in the preparation of litigation as well as to administer all tax work of the estate.[16]

---

**9.** *See* Adversary Proceeding case no. 81 A 3286.

**9a.** This figure includes $136,434,266 in unliquidated and/or contingent assets/claims.

**10.** *See* Order dated May 15, 1981.

**11.** *See* Order dated June 12, 1981.

**12.** The Official Unsecured Creditors' Committee was comprised of representatives of Houston Oil & Refining Inc., Catalytic, Inc., Horizon Petroleum Co., True Oil Purchasing Co., Listo Petroleum, Inc., Bountiful Corp., Sonatrach, West-

ern Crude Oil Co., and Intercontinental Oil Co. *See* Order dated June 19, 1981.

**13.** *See* Orders dated July 23, 1981 and April 11, 1982.

**14.** *See* Order dated June 16, 1984.

**15.** *See* Order dated October 17, 1984.

**16.** *See* Order dated September 4, 1984. (S & S has worked on *ECI* tax matters in both the chapter 11 and chapter 7 cases.)

The fee petitions of the various professionals named are presently at issue. Continental and the Member-Owners have interposed objections. They do not object to any of the amounts applied for: they have on numerous occasions expressed their belief that such amounts are warranted. Therefore, all amounts prayed for have been duly allowed by previous order of court. Continental and the Member-Owners do, however, object to any payment, at this time, of the fees allowed on the basis that there are allegedly no unencumbered assets in the estate from which such payment could be derived.

### III.

Because of the differing standards and law applicable to [superceded] chapter 11 professional fee applications and to chapter 7 professional fee applications, the applications *sub judice* are divided up, for purposes of discussion, in the following manner: (1) NM & S, SCK & G and the portion of S & S's services attributable to the chapter 11 case on the one hand; and, (2) H & H, MSN & H and the portion of services rendered by S & S attributable to the chapter 7 case on the other.

### A. Payment of Allowed Chapter 11 Professional Fees

The Banks and Member-Owners (collectively referred to as "objectors") object to the payment of chapter 11 professional fees at this time on the grounds that 1) there are no unencumbered assets in the estate; 2) under 11 U.S.C. § 726(b), payment of superceded chapter 11 administrative expenses are subordinated to chapter 7 administrative expenses; 3) Judge Kocoras'[17] remarks of March 6, 1984, *see* quote at 962, *infra*, preclude authorization of payment at this time; and 4) chapter 11

professionals should not receive payment at this time in light of the fact that it is presently impossible to assess accurately the value of the services rendered in terms of the results obtained.[17a] *See Objections of the Banks and Member-Owners to Applications for Interim Compensation,* filed June 19, 1985. In their Memorandum in Support, the objectors additionally argue that 1) the payment of fees may not be imposed on their collateral under 11 U.S.C. § 506(c) because the standards of that section have not been met; and 2) they did not consent either expressly or impliedly to the payment of professional fees out of their collateral. *See Memorandum of the Banks and the Member-Owners in Opposition to Applications for Interim Compensation,* filed July 11, 1985.

In response to these objections, NM & S argues that paragraph nine of the debtor-in-possession ("d.i.p.") financing order, entered by this court on May 21, 1981, permitted payment of professional fees out of funds subject to the objectors' liens. NM & S also reserves the right to argue that it is entitled to payment of fees pursuant to standards set forth in 11 U.S.C. § 506(c). SC & G likewise relies on paragraph nine of the d.i.p. financing order and the alleged concomittant consent of the objectors to payment of professional fees out of their collateral. SCK & G also relies on equitable principles and the assertion of "undue hardship" in support of its position. S & S joins in the aforementioned theories and additionally argues that the objectors are equitably estopped from objecting to payment in light of their acquiescence to payment of fees out of their collateral on a previous occasion.

---

**17.** The Honorable Charles P. Kocoras, District Judge, is administering the *ECI* case and related proceedings concurrently with this bankruptcy court.

**17a.** Though some courts continue to defer payment of fees until the value of services may be assessed in light of results obtained, *In re Pennsylvania Tire & Rubber Co. of Mississippi, Inc.,* 19 B.R. 124 (Bankr.N.D.Ohio 1980), the court

notes that since the enactment of the Bankruptcy Reform Act of 1978, the majority and better view is that "... the fact that the final results of the case cannot be determined should not preclude interim compensation for the reasonable value of the actual and necessary services rendered to date to the extent such are ascertainable." 2 *Collier's on Bankruptcy,* ¶ 331.03 at p. 331–8 (15th Ed.).

Initially, the court notes that the Honorable Thomas James, Bankruptcy Judge, has rejected the theory that paragraph nine of the d.i.p. financing order permits charging the collateral with payment of professional fees. *See* Transcript of Proceedings, held August 6, 1985, at p. 78. At the same hearing, Judge James also found no merit in S & S's theory that the objectors are equitably estopped from opposing payment of fees by their previous acquiescence to the payment of fees. *Id.* at p. 104. As a matter of comity, this court will not reconsider these theories at this time.

The court may also summarily dispose of another theory cited above: the court finds that the objectors' reliance on Judge Kocoras' March 6, 1984, remarks is misplaced and unpersuasive. The following is the quote upon which the objectors rely:

Now, we also have the application for authority to use certain cash receipts. ECI has applied and the unsecured creditors' committee have applied for authority to use certain cash receipts *to fund ECI's continued operations as debtor-in-possession,* including the continued prosecution of ECI's lawsuit against the Member-Owners.

The Banks, ARCO and the Member-Owners all oppose ECI's having access to these funds. The ground for this opposition is the assertion that the *cash receipts in question* constitute cash collateral in which the objectors have an interest, and that ECI is unable to furnish adequate protection for those interests. I think fairly read, the pleadings do suggest that the objectors do have an interest in *these* funds, and *these* are part of the collateral that were afforded to the objectors.

ECI argues that the Banks and ARCO have failed to show that they have an interest in the cash collateral. Alternatively, ECI argues that any interests that may exist are adequately protected.

In the Banks' most recent memorandum, they point out that their verified proofs of claim asserting liens on the collateral constitute prima facie evidence that their claims are valid. I think based on what I have read, that they are....

Accordingly, I will deny ECI's application *at the present time.*

Transcript of Proceedings, held April 6, 1984, at pp. 6–7 (emphasis supplied). It is apparent that Judge Kocoras' statements were limited in scope to the particular circumstances, and made in light of conditions prevailing over a year and a half ago. Judge Kocoras was considering a request for use of cash collateral for the purpose of funding the d.i.p.'s operating expenses—not a request for the payment of previously-awarded fees for professionals. This court does not perceive these remarks as in any way limiting its authority to order payment of fees at this time, providing that such payment would be permissible under applicable law.

Having thus disposed of certain issues, the court is now free to consider the more substantial and vexing issues presented. By way of preface, the court emphasizes that the propriety of the *amounts* applied for and allowed are not at issue. The only issue presented is whether the fees, or any portion thereof, may be paid at this time pursuant to 11 U.S.C. § 331.[18] Section 331 provides for interim payment to professionals employed pursuant to sections 327 and 1103. Whether such interim allowances are awarded, and in what amounts, were questions left by Congress to the sound discretion of the bankruptcy court.[18a] *Callister v. Ingersoll-Rand Financial Corp. (In re Callister),* 673 F.2d 305, 306 (10th Cir.1982). Final awards of compensation, in contrast, are controlled by 11 U.S.C. § 330 only.

Section 331, enacted as part of the Bankruptcy Reform Act of 1978, represents a

---

**18.** Hereinafter, section numbers referred to without specification of title will be sections codified in Title 11 of the United States Code.

**18a.** Likewise, the time of payment of administrative expenses is also within the discretion of the bankruptcy court. *In re American Resources Management Corp.,* 51 B.R. 713, 719 (Bankr.D.Ut.1985).

significant departure from prior law. *See generally* 2 *Collier's on Bankruptcy* ¶ 331.01 (15th Ed.). Under the prior bankruptcy act, there was no statutory authorization for awarding interim compensation; allowances of compensation were generally made at the conclusion of the administration of the estate.[19] *Id.* To eliminate the perceived inequity of such a system, Congress enacted section 331. H.R.Rep. No. 595, 95th Cong., 1st Sess. 330 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 42 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787. Reflecting this, the "Historical and Revision Notes" to the Code section state:

> "[t]he only effect of this section is to remove any doubt that officers of the estate may apply for, and the court may approve, compensation and reimbursement during the case, instead of being required to wait until the end of the case, which in some instances, may be years ... [t]his section explicitly authorizes [discretionary awards of interim compensation]." *Id.*

That interim awards of fees can and will be authorized in a proper case may hardly be questioned at this time. There does remain some question, however, as to whether such interim awards may be made in the face of an objection interposed by a creditor asserting, as in the present instance, a lien and/or superpriority[20] in substantially all of the assets of the estate. The issue has not been addressed by the Seventh Circuit, but has been considered by other Circuit Courts of Appeal, as well as by various district and bankruptcy courts. *Compare General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.),* 739 F.2d 73 (2nd Cir.1984) *with Callister v. Ingersoll-Rand Financial Corp. (In re Callister),* 673 F.2d 305 (10th Cir.1982). Unfortunately, the only proposition which these cases make clear is that there is substantial room for disagreement on the point.

■ The disagreement results because of the clash between two preeminent bankruptcy policies which the stated issue raises: the policy evident in sections 330 and 331, dictating that professionals practicing in bankruptcy should be compensated on a parity with professionals practicing in other areas, and should not be forced to fund the administration of the case; versus the policy behind sections 361–364, requiring that creditors' Fifth Amendment rights be protected adequately, thereby additionally ensuring that d.i.p.s will be able to obtain the post-petition financing necessary to effect a successful reorganization. From the general imbroglio, a few settled principles

19. Though there was no express statutory authorization for awarding interim compensation under the former Bankruptcy Act, in point of fact, the bankruptcy courts, exercising their inherent equitable powers, increasingly awarded interim fees to alleviate hardship and to avoid charging professionals with the funding of the administration of the case. *See e.g., In re Imperial "400" National, Inc.,* 432 F.2d 232, 235 (3rd Cir.1970); *In re Interstate Stores, Inc.,* 437 F.Supp. 14, 16 (S.D.N.Y.1977).

20. "Superpriority" is a term not defined in the Bankruptcy Code; it is used to describe a claim which, under applicable bankruptcy law and pursuant to court order, is to be paid ahead of some or all administrative expenses, and possibly ahead of secured creditors. *See generally* Ginsberg, *Bankruptcy* ¶ 10,705. A superpriority may be created in two ways: (1) under § 507(b), when a secured creditor seeks and is granted adequate protection, and such adequate protection subsequently proves to be inadequate, the secured creditor is entitled to a superpriority for the amount of the deficiency,

i.e., the amount by which he has been damaged by the continuation of the stay, the use of his collateral, or the like; and, (2) under § 364(c)(1) and (d), the court may grant a creditor a superpriority in order to induce such creditor to lend post-petition operating funds to the debtor. *Id.* In addition, under § 726(b), when a chapter 11 case is converted to a case under chapter 7, the chapter 7 expenses of administration take precedence over chapter 11 expenses of administration; thus the chapter 7 expenses of administration are occasionally referred to as having superpriority status. *See e.g., In re Codesco, Inc.,* 18 B.R. 225, 227 (Bankr.S.D.N.Y. 1982). The superpriority obtained pursuant to § 364(c)(1) and (d) will prime a superpriority obtained pursuant to § 507(b); while, in turn, a superpriority obtained pursuant to § 507(b) will prime superceding chapter 7 administrative expenses entitled to priority under § 726(b). *See generally* 2 *Collier's on Bankruptcy,* ¶ 361.01 (15th Ed.).

emerge. If, at the end of the case, there are no assets from which to pay administrative expenses beyond those subject to a valid secured claim, the professional is forced to forego compensation unless he can demonstrate that he has met the standards of section 506(c).[21] *Dozoryst v. First Financial Savings and Loan Assoc. of Downers Grove,* 21 B.R. 392 (N.D.Ill.1982). *See also* Savage, "The Secured Claimholder's Liability for the Costs and Expenses Incurred in Bankruptcy," 90 *Comm.L.J.* 430 (Oct., 1984). Yet, if it appears in such circumstances that the secured creditor in some way requested or encouraged professional services to be rendered, he will be deemed to have consented to having said professional's fees imposed on his collateral.[22] *In re Hotel Associates, Inc.,* 6 B.R. 108 (Bankr.E.D.Penn.1980). Such consent should not, however, be lightly inferred. *General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.),* 739 F.2d 73, 77 (2nd Cir.1984), citing *In re S & S Industries, Inc.,* 30 B.R. 395, 398 (Bankr.E.D.Mich.1983).

Though recovery of expenses under § 506(c) provides a limited avenue for obtaining fees, it is to be noted that "section 506(c) was not 'intended as a substitute for the recovery of administrative expenses that are appropriately the responsibility of the debtor's estate.' " *In the Matter of Trim-X, Inc. (Appeal of Maurice Levine),* 695 F.2d 296, 301 (7th Cir.1982), citing *In re Codesco, Inc.,* 18 B.R. 225, 230 (Bankr.S. D.N.Y.1982). "[A] trustee in bankruptcy

acts 'not on the authority of [secured creditors] and for their interest, but on the authority of the court and for the interest of the general creditors.' " *Trim-X, supra,* at p. 301, citing *Robinson v. Dickey,* 36 F.2d 147, 149 (3rd Cir.1929), *cert. den.* 281 U.S. 750, 50 S.Ct. 354, 74 L.Ed. 1161 (1930). It is this distinction—between the limited fees which may be charged against collateral pursuant to § 506(c), and the interim fees which may be charged to the estate generally—which the objectors and applicants in this case fail to make clear. Because this court finds that payment of some portion of interim chapter 11 fees at this time is justified pursuant to section 331, it does not reach the issue of whether the chapter 11 fee applicants might be entitled to have their fees charged against the objectors' collateral[23] pursuant to section 506(c) in the unlikely event that that should become necessary.

█ "The Bankruptcy Code does not require everyone entitled to payment from the estate to wait until the end of the case to be paid." Ginsberg, *Bankruptcy* ¶ 4502 at p. 4052. "[W]hile other administrative expenses must wait until confirmation ... or liquidation ... for reimbursement, fees are payable on an interim and therefore preeminent basis under 331." *In re Callister,* 15 B.R. 521, 534 (Bankr.D.Utah 1981) (citations omitted). The assertion of a superpriority claim does not by itself preclude an award of interim fees. *In re American International Airways, Inc.,* 47 B.R. 716

---

**21.** Section 506(c) provides:

[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Because section 506(c) specifically refers to "the ·trustee," it is generally held to authorize payment only to the trustee or d.i.p., although there is some case law to the contrary. *In re New England Carpet Co.,* 28 B.R. 766, 771 (Bankr.D. Vt.1983), citing *In re Codesco, Inc.,* 18 B.R. 225, 230 (S.D.N.Y.1982). Under section 506(c), the trustee has the burden of demonstrating that the expenses to be awarded were necessary, benefitted the secured creditor, and were reasonable. *In the Matter of Trim-X, Inc. (Appeal of Maurice*

*Levine),* 695 F.2d 296, 299 (7th Cir.1982); *Sells v. Sonoma V (In re Sonoma V),* 24 B.R. 600 (B.A.P. 9th Cir.1982); *Brookfield Production Credit Assoc. v. Borron,* 738 F.2d 951 (8th Cir. 1984).

**22.** The "benefit" theory embodied in section 506(c), and the theory of express or implied consent are often treated as two components of the same theory. *See In the Matter of Trim-X, Inc. (Appeal of Maurice Levine),* 695 F.2d 296, 301 (7th Cir.1982).

**23.** The court is assuming for purposes of discussion that the objectors' liens and/or superpriority claims will be allowable in full. The court expresses no opinion at this time as to the merits of said assumption.

(E.D.Penn.1985). This is not to say that an interim award can be made without reference to a schedule of priorities.[24] *IML Properties, Inc. v. Interstate Rental of Utah, Inc. (In re IML Freight, Inc.)*, 52 B.R. 124, 13 B.C.D. 374 (Bankr.Ut.1985). When it appears, however, that there will be sufficient assets in the estate to pay those priority claims, an interim award of fees may be justified. *American International, supra.*

By balancing the likelihood of sufficient assets against the assertion of the superpriority claim, a fair and equitable result may be achieved. Professionals who have rendered valuable services are not forced to forego all compensation indefinitely, while priority claimholders are protected in light of the clear power and duty of the court to require professionals to disgorge the fees in the unlikely event that there is ultimately a shortfall. *See In re Vermont Real Estate Investment Trust*, 26 B.R. 905, 10 B.C.D. 147 (D.Ver.1983), noted with approval, Norton Bankruptcy Law Adviser 1984 no. 10, Article 4, "Professionals Provide Interim Financing?" This is the position espoused by the Tenth Circuit in the *Callister* case, *supra*, when it affirmed with approval the detailed and closely-reasoned opinion of the bankruptcy court. *In re Callister*, 15 B.R. 521, 8 B.C.D. 446 (Bankr.D.Utah 1981), *appeal dismissed*, 673 F.2d 305 (10th Cir.1982), *aff'd and bankruptcy court rationale adopted*, 13 B.C.D. 21 (10th Cir.1984).

The *Callister* bankruptcy court held, inter alia, that "[t]here is a presumption ... that [interim fees] will be paid notwithstanding the existence of a superpriority," 15 B.R. at 535, and that such payment may be made in the exercise of the bankruptcy court's discretion. The Tenth Circuit dismissed the *Callister* appeal on the grounds that it was not a final, appealable order, stating that "interim allowances are always subject to the court's reexamination and adjustment ... [t]hey are refundable to the estate in cases of misconduct." [24a] 673 F.2d at 307. Two years later, in an appeal of a presumably final order entered in the same case, the Tenth Circuit stated, "we are in complete accord with the result reached by the bankruptcy court as well as its rationale ... we affirm...." 13 B.C.D. at 21.

The objectors cite several cases which they argue dictate a contrary result. The court finds that on the whole, the cited cases are distinguishable or unpersuasive. For example, it has been suggested that the bankruptcy case of *IML Properties, Inc. v. Interstate Rental of Utah, Inc. (In re IML Freight, Inc.)*, 52 B.R. 124, 13 B.C.D. 374 (Bankr.Ut.1985) somehow overshadows the *Callister* decision. In *IML*, the trustee in a superceding chapter 7 case argued that chapter 11 fee awards should be paid *in full* ahead of other administrative claims entitled to equal priority under § 507(a), and *regardless* of whether such other claimants were ultimately paid. 52 B.R. 124, 13 B.C.D. at 379. The trustee in *IML* stipulated that the estate would not have sufficient funds to pay all administrative claims, yet insisted that in light of the presumption in favor of payment of fees to professionals, [*Callister*], the court should immediately authorize the payment of said fees. *Id.* The *IML* court held, and rightly so, that where there are insufficient funds

---

**24.** Under the Bankruptcy Code, a detailed schedule of priorities is established. 11 U.S.C. § 507(a). Administrative expenses, entitled to a first priority under this schedule, include taxes incurred post-petition, certain fines and penalties, certain expenses of a creditor and custodian, as well as professionals' fees. *See* 11 U.S.C. § 503(b)(1)–(6). In the event that there are insufficient funds in the estate to pay an entire class of allowed priority claims in full, each claimholder in the class will divide the available funds pro rata. *See* 11 U.S.C. § 726(b).

Superpriority claims are generally paid ahead of all administrative claims. *See* note 20, *supra*. "This order of priorities may not be varied." 3 *Collier's on Bankruptcy* ¶ 503.03 at p. 503–11 (15th Ed.).

**24a.** The stated proposition is equally true in a case where it ultimately appears that interim fees were inprovidently granted. *See generally* 2 *Collier's on Bankruptcy*, ¶ 331.03 and cases cited therein (15th Ed.). *Cf. In re Burlington Tennis Associates*, 34 B.R. 839 (Bankr.D.Vt. 1983).

to pay all claimants of equal priority within a certain class, none may be paid until their pro rata share may be effectively determined.[25] 52 B.R. 124, 13 B.C.D. at 384. In doing so, the *IML* court, harmonized its position with the *Callister* opinion; it did not, and could not, overrule it.[26]

The *IML* case, further, with its stipulated shortfall of assets to cover superpriority claims—much less administrative priorities—differs sharply from the facts presented by the case at bar. Presently, there is every indication that there will be assets in the estate to cover priority claims and, beyond that, to confer some dividend to unsecured creditors. The trustee is presently holding an aggregate sum of $29,600,000. Eighty-nine preference and various adversary proceedings are presently pending, with several million dollars in damages anticipated. *See Responsive Memorandum in Support of Application for Payment of Interim Compensation to Trustee's Counsel,* filed October 18, 1985, at p. 10. Of $251,000,000 owing the Banks

pre-petition, and $18,000,000 owing the Banks post-petition, $86,000,000,[26a] remains unpaid at this time. The Member-Owners are owed $541,375 for amounts they lent the d.i.p. post-petition and would appear to be amply protected by the $29,600,000 presently on hand in the estate.[27] *Cf. In re American Resources Management Corp.,* 51 B.R. 713, 719 (Bankr.Utah 1985) ("[i]t may be appropriate to authorize payment of administrative expenses ahead of superpriority claims when there are adequate unencumbered assets in the estate, *or when the bankruptcy judge has adequate assurances that there will be*") (emphasis supplied).

Another example of a case relied upon by the objectors is the *Flagstaff* case out of the Second Circuit. *General Electric Credit Corp. v. Levin & Weintraub (In re Flagstaff Foodservice Corp.),* 739 F.2d 73 (2nd Cir.1984); *see also "Flagstaff II," General Electric Credit Corp. v. Peltz et al. (In re Flagstaff Foodservice Corp.),* 762 F.2d 10 (2nd Cir.1985). In *Flagstaff,*

**25.** The *IML* court stated that:
[t]he essential fact to be considered ... is the *certainty*—not merely the possibility—that there will be insufficient assets to pay all costs of administration. The question is whether the Court should now, in the face of the *estate's certain inability* to pay Chapter 11 administrative expenses in full, authorize *full payment* to the trustee's accountants and attorneys, and the other chapter 11 professionals, *knowing that some measure of such fees will have to be repaid* in order to effect a pro rata distribution ...
52 B.R. 124, 13 B.C.D. at 385 (emphasis supplied). The court's resolution of this question in the negative is in accord with the decision in *Matter of Codesco, Inc.,* 15 B.R. 354 (Bankr.S.D. N.Y.1981) (likelihood of insufficient assets precluded interim payment of fees), upon which the objectors also strongly rely. *But cf. Citibank N.A. v. Official Creditors' Committee of Wilson Freight Co. (In re Wilson Freight Co.),* 21 B.R. 398 (S.D.N.Y.1982) (pre-*Flagstaff, infra,* case affirming award of interim fees despite the fact that creditors were undersecured). Their reliance in *Codesco* is misplaced for the same reason it was misplaced in *IML*—both courts were dealing with situations where there were insufficient assets to distribute to priority creditors; as distinguished from the present case, where there is a strong likelihood of sufficient assets in the estate for distribution to priority claimholders.

**26.** In this connection, the *IML* court stated:
[s]everal years have now elapsed since this court rendered its decision in the *Callister* case, but upon review of that case in light of numerous later decisions, the Court remains convinced that *it was correctly decided.* The standards of fairness and equity, recognized in *Callister* to be at the heart of the principle of interim compensation, permit the court in its discretion to authorize the payment of professional persons ahead of other administrative and superpriority claimants. The appropriate exercise of that discretion will necessarily depend upon the facts and circumstances of each case and may not impair the rights of equal or senior priority claimants to payment.
52 B.R. 124, 13 B.D.C. at 386 (emphasis supplied).

**26a.** Approximately $60,000,000 is owed the Banks for pre-petition indebtedness, while approximately $26,000,000 (figure including interest accrued) is owed for post-petition d.i.p. financing.

**27.** It is worthy of note that whether the Member-Owners and/or the Banks will be able to maintain their priority and/or secured positions is open to question in light of the pending adversary proceeding against them, requesting equitable subordination and other relief. *See* adversary proceeding no. 81 A 3286.

the Circuit Court of Appeals reversed the lower court for awarding fees out of a superpriority claimholder's collateral without reference to any schedule of priorities. The objectors cite this holding as compelling authority for their position. This conclusion may be unwarranted, however, in light of the fact that while the Second Circuit refers initially to section 331, its holding speaks to final awards under section 330.[27a] 739 F.2d at 75 ("[w]e conclude that the district court erred in holding that *section 330* 'empower[ed] the Bankruptcy Judge to make awards without reference to any schedule of priorities ...' ") (emphasis supplied). The significance of such a distinction cannot be overemphasized. Congress, by enacting the statutorily unprecedented section 331, made a policy choice. Henceforth, the bankruptcy bar was to be treated exactly like counsel practicing in other areas,[28] and consequently, was not to be forced to forego compensation until the ultimate distribution in the case. This court will not limit the import of the section by unnecessarily restricting its application.

The *Flagstaff* court did hold, however, that to the extent the decision in *Callister, supra,* dictated a different result than the one it reached, it declined to follow it. 739 F.2d at 75. This statement evidences an apparent conflict between the Tenth and Second Circuits on the point. Absent a ruling by the Seventh Circuit, this court is inclined to follow the approach of the Tenth Circuit in *Callister, supra: Callister* appears to effectuate more closely the intent of Congress by allowing discretion to balance the competing interests of secured and/or superpriority claimholders and pro-

fessional fee applicants on a case-to-case basis.

The cases in the Tenth Circuit on point are cohesive and fair. Starting with the *Callister* decisions, the Circuit indicated a willingness to allow payment of professional fees regardless of the assertion of a superpriority claim if the equities so dictated. Under this standard, payment of fees would be allowed where there are assets on hand to cover all priority claims, *Callister, supra,* or, if, as here, it appears likely that there will be sufficient assets in the estate to cover priority claims. *American Resources, supra,* 51 B.R. at 719. *See also In re American International Airway, Inc.,* 47 B.R. 716 (Bankr.E.D.Penn. 1985). On the other hand, if it appears unlikely that there will be sufficient assets in the estate to cover priority claims, payment of fees will be deferred until each administrative claimants' pro rata share can be determined. *IML, supra. But cf. Citibank N.A. v. Official Creditors' Committee of Wilson Freight Co. (In re Wilson Freight Co.),* 21 B.R. 398, 399 (S.D.N.Y.1982) (pre-*Flagstaff* case affirming interim award of fees in undersecured case).

Though determining whether there will be sufficient assets in the estate to cover priority claims may at times be a difficult and speculative task, an inaccurate determination will not ultimately harm any claimholder in light of the fact that fees improvidently granted will be returned to the estate for disbursement to such a claimholder. On the other hand, if no such determination is made and members of the bankruptcy bar are forced to wait years to receive compensation for their services, the stated policy of Congress in favor of treat-

**27a.** It appears that the *Flagstaff* court's statements were addressed to section 330 rather than section 331 because the amount of interim fee awards is determined pursuant to standards set out in section 330 in any event. *See generally* 2 *Collier's on Bankruptcy* ¶ 331.03 (15th Ed.).

**28.** *See* discussion at pp. 963–64, *supra.* In the same vein, Congress made another unprecedented change in the Bankruptcy Reform Act of 1978: it legislated that members of the bankruptcy bar were henceforth to be paid on a parity with other members of the profession,

thereby obliterating years of caselaw holding bankruptcy counsel subject to a standard of "strict economy of administration." *See generally* 2 *Collier's on Bankruptcy* ¶ 330.05[e] (15th Ed.) ("[s]ection 330 abandons the peculiar notions of conservation of the estate and economy of administration.... [t]o the extent that prior case law is inconsistent it no longer retains vitality.") When these two legislative changes are viewed in conjunction, as they should be, the purpose of Congress is manifest.

ing bankruptcy practitioners on a parity with other bar members will be subverted, while no benefit would inure to the secured claimholder because he will not be paid until an advanced stage in the case in any event.

■ In light of the foregoing, this court finds that a partial payment of fees to chapter 11 applicants is an appropriate resolution of the instant matter. By authorizing an interim payment at this time of twenty-five percent (25%)[29] of fees previously allowed the hardship to the applicants may be alleviated while the objectors remain unprejudiced. The 25% interim award does not affect the status of the objectors' claims, nor will it reduce the amount they will receive on their claims in the ultimate distribution.[30]

### B. Payment of Allowed Chapter 7 Professional Fees

■ The chapter 7 applicants stand on a different footing than the chapter 11 applicants by virtue of section 726(b).[31] Under section 726(b), expenses incurred and allowed in a superceding chapter 7 case such as the one at bar, take precedence over expenses incurred and allowed in the superceded chapter 11 case. *In re New England Carpet Co.*, 28 B.R. 766, 770 (Bankr. D.Vt.1983). This precedence has been referred to as a "superpriority" for "burial

expenses," and is "... intended to provide an incentive to encourage capable trustees and professionals to act in superceding cases." *In re Codesco*, 15 B.R. 354, 355 (Bankr.S.D.N.Y.1981); *"Codesco II," In re Codesco*, 18 B.R. 225, 227 (Bankr.S.D.N.Y. 1982). Whatever the nomenclature, superceding chapter 7 administrative expenses are entitled to be paid in full before priorities of the next rank—administrative expenses incurred in the superceded chapter 11 case—are paid in full or in part. 11 U.S.C. §§ 726(b) and 507(a)(1). *See also IML Properties, Inc. v. Interstate Rental of Utah, Inc. (In re IML Freight, Inc.)*, 52 B.R. 124, 13 B.C.D. 374, 382 (Bankr.D.Ut. 1985). If there are insufficient funds in the estate to satisfy allowed section 726(b) claims in full, the funds on hand will be shared pro rata by each section 726(b) claimant. *Id.*

■ In terms of the *ECI* case, the section 726(b) priority translates into a precedence for the allowed fees of the chapter 7 applicants (H & H, MSN & H, S & S) over those of the chapter 11 applicants (NM & S, SCK & G, S & S). In turn, the objectors claim precedence over all administrative claimants—both chapter 11 and 7—pursuant to the terms of the d.i.p. financing orders entered during the inception of this case.[32] The arguments that the objectors

---

**29.** It has become customary for bankruptcy courts to award a flat percentage of interim awards to be paid in circumstances where there is an objection to a larger award, doubt as to whether a larger award could ultimately be sustained by the estate, or uncertainty as to value of services rendered in terms of results obtained. *See generally* 2 *Collier's on Bankruptcy* ¶ 331.03 (15th Ed.) (noting, however, that some courts have rejected entirely the "holdback" theory in light of clear Congressional policy evinced in section 331). Though there is no real doubt that there will be sufficient assets in the *ECI* estate to pay both superpriority and administrative claimants, the court finds it prudent to allow only 25% payment at this time in light of the larger percentage awarded chapter 7 applicants, *infra,* and the contingent nature of some of the estate's assets.

**30.** The court notes that the Trustee supports such a provisional payment to chapter 11 applicants so long as it does not interfere with the

administration of the chapter 7 case. *See Responsive Memorandum in Support of Appl. for Payment of Interim Compensation to Trustee's Counsel,* filed October 18, 1985, at p. 14, n. 2.

**31.** Section 726(b) provides in pertinent part:
... in a case that has been converted to this chapter [chapter 7] under section 1112 or 1307 of this title [title 11], a claim allowed under section 503(b) ["allowance of administrative expenses"] of this title incurred under this chapter after such conversion has priority over a claim allowed under section 503(b) of this title incurred under any other chapter [chapters 11 or 13] or under this chapter before such conversion ...
11 U.S.C. § 726(b).

**32.** The financing agreement between the d.i.p. and the Banks provided that it was to be "binding upon any subsequently appointed Trustee, either in a Chapter 11 or any other Chapter of the Bankruptcy Code [sic]." *See* Order, entered

make against payment of chapter 7 allowed fees are virtually identical to those made against payment of chapter 11 allowed fees: [33] 1) that the April 6, 1984 remarks of Judge Kocoras (*see* discussion at p. 962, *supra*) preclude payment at this time; 2) that there are presently no assets in the estate from which to pay fees since all assets on hand are encumbered by the objectors' superpriority liens and/or pre-petition security interests; and, 3) that the August 14, 1985 Orders entered by Judge James in this case, allowing fees but deferring payment, somehow preclude payment at this time. *See Objections to the Payment of Interim Compensation to Miller, Shakman, Nathan & Hamilton and Hannanfan & Handler, Ltd.*, filed August 26, 1985, at p. 2 of 2.

The rulings by Judge James relating to the allowance of fees to chapter 11 applicants in this case were embodied in brief minute orders reserving payment "... subject to further order of the court ... [f]or

May 21, 1981, par. 13. It also recited that repayment of the loan "shall be prior and superior in payment to any priority claim, administrative expense, or any other claim whatsoever, ... incurred in this Case, or in any superceding case under Chapter 7 of the Bankruptcy Code." Order, *supra*, at par. 6.

The agreement between the d.i.p. and the Member-Owners provided in relevant part that the debt incurred

shall at all times be senior to the rights of the Debtor-in-Possession or any sucessor trustee in this or any subsequent proceeding under the Bankruptcy Code. No costs or expenses of administration, which have been or may be incurred in these proceedings pursuant to Section 1112 of the Bankruptcy Code, or in any other proceedings related hereto, and no priority claims are or will be prior to or on a parity with the claims of the Member-Owners arising out of the loans provided for herein.

*See* par. 4 of Orders entered November 24, 1982, January 5, 1983, and February 2, 1983. Pursuant to these orders, the Member-Owners are to be paid in pari passu with the Banks.

The court notes the problems inherent in a situation such as this, where immediate financing is needed post-petition to keep the d.i.p. afloat: the creditors and court are faced with making a summary decision as to whether to grant superpriority status to the lender—a matter of paramount importance, worthy of greater consideration than time, unfortunately, allows. These and similar problems have been com-

the reasons stated in open court on August 6, 1985...." *See* Minute Orders entered by the Honorable Thomas James, on August 14, 1985. The transcript of the August 6, 1985 hearing in this case reflects that Judge James held only that (1) paragraph 9 of the d.i.p. financing order did not permit fees for [chapter 11] professionals to be charged against the collateral of the objectors absent the objectors' consent or a valid section 506(c) claim, and, (2) the waiver and estoppel arguments made by certain [chapter 11] applicants were nonmeritorious under the facts presented. Judge James did not, as the objectors suggest, reject the section 331 rationale for present payment of fees which the court adopts herein.

That theory aside, this court must reject the other theories put forth by the objectors for the same reasons which were stated in the discussion, *supra*, relating to payment of chapter 11 allowed fees: it appears that there will ultimately be suffi-

mented upon, and some courts have gone so far as to rule that hastily entered d.i.p. financing orders may be reevaluated in light of changed circumstances. *See e.g., Otte v. Manufacturers Hanover Commercial Corp. (In re Texlon Corp.)*, 596 F.2d 1092, 5 B.C.D. 109, 114–15 (d.i.p. financing order providing for cross-collateralization entered ex parte may be reevaluated in the exercise of the bankruptcy court's discretion even after expiration of time for appeal). *See also* 7 Moore, *Federal Practice* ¶ 60.18 at p. 215 ("[t]here is practical utility in the application of a rule which permits the vacation or modification of bankruptcy orders where subsequent events presented during administration demonstrate the necessity therefor ..."). *But see* 11 U.S.C. § 364(e). This approach has been criticized, however, as unduly undermining confidence in properly entered orders of the bankruptcy court and discouraging post-petition lending. *See e.g., In re American Resources Management Corp.*, 51 B.R. 713, 722 (Bankr.D. Ut.1985).

**33.** The court notes that on April 22, 1985, ARCO also interposed objections to *allowance* of chapter 7 fees. There is no indication in the record that ARCO renewed or pursued its objections as to the *payment* of allowed chapter 7 fees. In any event, the objections were premised on the same theories discussed herein, and are likewise rejected to the extent that they are inconsistent with this order authorizing provisional payment of fees.

**970**

cient assets in the estate to pay all priority claims, and, therefore, the Congressional policy underlying section 331 should not be indiscriminately subverted. The court finds that the balancing of the likelihood of sufficient assets against the possible superpriority claim of the objectors, in combination with the failsafe mechanism afforded the objectors by the fact that fees will be disgorged if there is ultimately a shortfall, is adequate protection of their interests.

This court does not state that professionals may invariably be awarded payment of their fees in the face of an objection by a superpriority claimant, nor does it hold that there is a presumption in favor of payment in such circumstances. *Cf. In re Callister,* 15 B.R. 521, 535, 8 B.C.D. 446 (Bankr.D.Ut. 1981). It simply holds that the issue must be considered on a case-to-case basis, and the facts must be viewed in toto with an eye to doing substantial justice. The bankruptcy court is clearly a court of equity. *SEC v. U.S. Realty & Improvement Co.,* 310 U.S. 434, 455, 60 S.Ct. 1044, 1053, 84 L.Ed. 1293 (1940) and progeny. As such, it will not summarily resolve doubts in favor of placing counsel in the repugnant and statutorily-disfavored position of financing the administration of the case.

Accordingly, this court finds that the chapter 7 fee applicants are presently entitled to seventy-five percent (75%) of all previously-allowed fees. Chapter 7 fee applicants will be paid a greater percentage than chapter 11 fee applicants in this case because of the superior status of their claims under section 726(b), while payment of part of the allowed fees will be deferred as a hedge against the unlikely event that there will be insufficient assets in the estate to pay all priority claims in full.

---

**34.** The parties have briefed the issue of whether preference proceeds are subject to the objectors' superpriority claims and/or pre-petition security interests (assuming them to be valid) and hence, whether fees may be paid out of these proceeds regardless of the objections of the Banks and Member-Owners. *See Memorandum in Support of Appl. for Payment of Interim Compensation to Trustee's Counsel,* filed September

IV.

In summation, this court orders Jay A. Steinberg, trustee of the *ECI* estate, to pay instanter 25% of the cited, previously-allowed interim fees of the chapter 11 applicants, and 75% of the cited, previously-allowed interim fees of the chapter 7 applicants.[34] 11 U.S.C. § 331. This provisional, interlocutory award is subject to further order of this court. *Cash Currency Exchange, Inc. v. Shine (Matter of Cash Currency Exchange, Inc.),* 762 F.2d 542 (7th Cir.1985).

IT IS SO ORDERED.

13, 1985; *Reply Memorandum in Opposition to Appl. for Payment of Interim Compensation to Trustee's Counsel,* filed October 10, 1985; and, *Responsive Memorandum in Support of Appl. for Payment of Interim Compensation to Trustee's Counsel,* filed October 18, 1985. The court reserves ruling on this issue until it is clear that it must be decided.